Filed 6/12/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ASSOCIATION OF ORANGE COUNTY DEPUTY SHERIFFS,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>COUNTY OF ORANGE et al.,<br><br>    Defendants and Respondents. | G047167<br><br>(Super. Ct. No. 30-2011-00442746)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Charles Margines, Judge.  Affirmed.

Law Offices of James E. Trott and James E. Trott for Plaintiff and Appellant.

Nicholas S. Chrisos, County Counsel, and Leon J. Page, Deputy County Counsel, for Defendants and Respondents.

\*        \*        \*

By Orange County Sheriff Sandra Hutchen's (the Sheriff) order, effective January 1, 2011, any member of the Orange County Sheriff's Department (the Department), who is under investigation for misconduct, is no longer permitted access to the Department's internal affairs investigative file before being interviewed by an internal affairs investigator. The Association of Orange County Deputy Sheriffs (the Association) filed a petition for writ of mandate and sought a preliminary injunction against Orange County (the County), the Department, the Sheriff, and the County's board of supervisors (collectively, defendants). The Association alleged the Sheriff's order violated the meet-and-confer requirements of the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500 et seq.) and constituted a breach of the Association's applicable memorandum of understanding with the County (the MOU). (All further statutory references are to the Government Code unless otherwise specified.) The trial court denied the Association's request for a preliminary injunction and petition for writ of mandate.

We affirm. We hold the Sheriff's order delaying access to the internal affairs investigative files until after the investigative interview was within her legal authority and not subject to meet-and-confer requirements. Our holding applies the analysis of our Supreme Court in *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564 (*Pasadena*). We also address a question the California Supreme Court expressly did not reach in *Pasadena*, and hold a long-standing past practice of preinvestigative interview access to the investigative file, alone, does not constitute a working condition within the meaning of the MMBA.

The trial court properly applied the test for determining whether an issue falls within the scope of representation under the MMBA as set forth by our Supreme Court in *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623 (*Claremont*) and *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public*

2

*Employment Relations Bd.* (2011) 51 Cal.4th 259 (*International Assn. of Fire Fighters*).

For the reasons we will explain, the Sheriff's order did not significantly or adversely

affect wages, hours, or other terms and conditions of employment within the meaning of

the MMBA. Even if it did, the Sheriff's order fell outside the scope of representation

because it was a fundamental managerial or policy decision that was not outweighed by

the benefit to employer-employee relations that would result from bargaining about the

decision. The Sheriff's order did not violate any express or implied term of the MOU.

FACTS

The Department has an internal affairs bureau of its Professional Standards

Division.[1] For "many years," the Department allowed deputies, investigators, and

sergeants, who were under investigation for misconduct and possibly subject to discipline

(principals), "complete access" to the Department's internal affairs investigative files

before submitting to an investigative interview by internal affairs investigators.[2]

The investigative files include memoranda written by managers and

supervisors; witness statements gathered by an internal affairs investigator; transcripts of

interviews with other employees; and, when available, physical evidence including video

footage. Before the Sheriff's order became effective, a principal was permitted to spend

as much time "as needed" to review the investigative file, and might spend several hours,

if not days, reviewing the file. A principal was also allowed to review the contents of the

_____

[1] The Professional Standards Division conducts approximately 400 internal affairs
investigations of alleged misconduct by the Department's members each year,
approximately half of which result in some kind of discipline, ranging from a verbal
reprimand to discharge.

[2] Defendants submitted evidence that 135 investigators who worked in the district
attorney's office had not been provided preinvestigative interview access to the
investigative file even though they are part of the same bargaining unit as the deputies,
investigators, and sergeants, covered by the MOU, and represented by the Association.

3

investigative file with his or her attorney or union representative, and to make personal notes of the contents.

In her declaration, the Department's Captain Linda Solorza stated the Department's practice of providing preinvestigative interview access to the investigative file interfered with the internal affairs bureau's ability "to conduct prompt, thorough, and fair investigations into peace officer misconduct." Evidence showed the preinvestigative interview access practice did not promote truthseeking and was inconsistent with techniques employed by the Department in other kinds of investigatory interviews.[3] According to Solorza, providing such access threatened to color the principal's recollection of events or "lead that person to conform his or her version of an event to that given by witnesses already questioned."

In his declaration, the Department's Lieutenant Jeffrey Hallock, who had served as a sergeant in the Professional Standards Division, stated the Department's practice created the temptation for a principal or witness "to conform his or her statements to the statements of others to either protect the witness's colleagues, or to protect himself or herself." Solorza added in her declaration: "[I]f the principal under investigation does not know the sum total of what the Internal Affairs investigator knows, the principal will have more reason to be truthful and forthright when responding to the investigator's questions. This would also be the case in interviews with witnesses. Witnesses are more often truthful and forthright when they know that the principal will not have access to the witness's interview prior to the principal's own interview. When the principal does not know what the interviewing Investigator knows, the Investigator is also better positioned to assess the principal's credibility."

---

[3] The declaration of the Department's Commander Steve Kea stated in part: "It has been my experience that most law enforcement agencies in the State of California do not provide their employees with an opportunity to review the investigative file prior to conducting the employee's investigative interview . . . ."

Solorza also stated the preinvestigative interview access practice had a "chilling" effect on witnesses. For example, in one sexual harassment case, the victims and witnesses of the alleged misconduct expressed concern about the disclosure of their statements to the principal (while the investigation was still pending) because they feared retaliation before the Department could take appropriate remedial action to address any misconduct.

Solorza further stated in her declaration the Department's practice particularly hindered investigations that involved more than one principal. For example, if one principal abruptly resigned after reviewing his or her investigative file but before his or her investigative interview, the Professional Standards Division would be unable to compel that principal to provide a statement regarding the conduct of the other principals under investigation. The completion of such investigations was delayed by principals seeking to review other principals' investigative interviews before submitting to their own interviews.

The Sheriff described the Department at the time of her appointment in 2008 as "reeling from a lack of accountability, transparency, and leadership." Her predecessor was under investigation for witness tampering and related corruption charges. The Department was also dealing with the murder of a jail inmate and allegations that "jail deputies relied on 'shot callers' to control other inmates in the county jails." The Sheriff pledged to the public that she "would restore accountability, openness, trust, and transparency to the operations of the Sheriff's Department."

In December 2010, the Sheriff decided to reform the manner in which internal affairs investigations of principals were conducted. She concluded a policy change was "absolutely necessary to ensure the integrity and reliability of future internal affairs investigations" and to bring the Department in line with what is considered to be the "best practice" in conducting internal affairs investigations.

5

On December 28, 2010, the Sheriff ordered, by executive command, that effective January 1, 2011, the Professional Standards Division would stop providing all principals with preinvestigative interview access to the investigative files. The change in practice was not made in response to any specific instance of misconduct, but was made "in order to improve the reliability and integrity of the Department's internal affairs investigations." For cases investigating misconduct, which were initiated before January 1, 2011, the Department continued to provide preinvestigative interview access to the investigative file.

In her declaration, Solorza stated: "[A]s required by the Public Safety Officer's Procedural Bill of Rights Act and also by the *Skelly* decision (*Skelly v. State Personnel Board*, 15 Cal.3d 194 (1975)) when discipline is proposed, a peace officer is provided with a copy of all the materials (including all investigative files) on which the decision to impose discipline is being based. However, as a result of the Sheriff's policy decision, the investigative materials are now provided to the peace officer only when discipline is proposed, instead of prior to the employee's investigative interview."

The change in practice did not alter or otherwise affect the Department's standards of conduct or ethical canons; the Department's employees were already prohibited from making a false statement to superiors and other employees. The MOU did not address the issue, much less state, that the Department would provide any principal with preinvestigative interview access to the investigative file.

The Association immediately objected to the Sheriff's order and asserted that withdrawal of preinvestigative interview access to the investigative file was a mandatory item of bargaining, subject to the meet-and-confer process of the MMBA. The Sheriff responded that the change in the Department's practice, implemented by her order, "is not a subject that requires negotiation."

6

PROCEDURAL BACKGROUND

I.

THE ASSOCIATION FILES A PETITION FOR WRIT OF MANDATE
AGAINST DEFENDANTS.

In January 2011, the Association filed a petition for writ of mandate under Code of Civil Procedure section 1085 (the petition) against defendants to enforce its collective bargaining rights under the MMBA and the MOU. The petition alleged defendants have a "ministerial duty" to follow the law with regard to public employer-employee relations and failed to do so because they unilaterally implemented a change in working conditions by "no longer following the long standing practice of providing investigative materials for review prior to Internal Affairs interrogation, without meeting and conferring as required by law." The petition further alleged defendants' conduct also violated the so-called "zipper clause" contained in article XXIII of the MOU, which required the parties' mutual agreement to negotiate "any subject matter covered herein or with respect to any other matter with[in] the scope of representation" during the MOU's term.

The petition sought issuance of a peremptory writ of mandate commanding defendants "not to change the Internal Affairs investigation process as it pertains to the provision of all investigative materials to members of the bargaining unit represented by [the Association] prior to such members being interrogated in connection with a Personnel Investigation, or other investigation of alleged misconduct, by employees of [the Department], absent agreement to do so reached as part of the collective bargaining process for a successor agreement to the current Memorandum of Understanding which expires on October 4, 2012, and to take no actions to unilaterally implement any change in that practice until such time."

## II.

### THE TRIAL COURT DENIES THE ASSOCIATION'S REQUEST FOR A PRELIMINARY INJUNCTION.

In January 2011, the Association filed an ex parte application requesting an order to show cause regarding the issuance of a preliminary and permanent injunction, and a temporary restraining order. The Association sought to enjoin defendants from withdrawing the Department's practice of providing preinvestigative interview access to the investigative file until agreement to do so is reached as part of the collective bargaining process. The Association asserted it "will be irreparably damaged if the obligation to refrain from implementing unilateral changes in working conditions is not enforced by this Court in that the [Association]'s collective bargaining rights under the [MMBA] [citation] will have been negated and the terms of the current Memorandum of Understanding will be rendered null and void." As in the petition, the Association further asserted the zipper clause of the MOU contained in article XXIII provides that during the term of the MOU, the parties may meet and confer on issues within the scope of representation only if they mutually agree to do so.

The trial court denied the Association's request for a preliminary injunction on the grounds the Association failed to demonstrate a likelihood of prevailing on the merits of the petition and also failed to show irreparable harm.

## III.

### THE TRIAL COURT DENIES THE PETITION; JUDGMENT IS ENTERED; THE ASSOCIATION APPEALS.

The trial court denied the petition for the reasons set forth in its minute order, described as follows. The court concluded that the Sheriff's order, implementing the withdrawal of preinvestigative interview access to the investigative file, did not

8

violate the MMBA because it did not "implicate or sufficiently impact wages, hours or working conditions"; it constituted a "fundamental policy decision supported by sufficient rationale"; and that "[o]n balance, any negative impact on employment conditions is substantially outweighed by the Sheriff Department's need for unencumbered decision-making in how to investigate deputy misconduct." The court further concluded the Sheriff's order did not breach any express term of the MOU. The court also rejected the Association's argument that preinvestigative interview access to the investigative file was an implied term of the MOU, finding "no evidence was presented from which it can be concluded that 'pre-interview access' or any past practice was intended to be a part of the MOU."

Judgment was entered denying the petition. The Association appealed.


DISCUSSION

I.

THE TRIAL COURT PROPERLY DENIED THE PETITION.


A.

*General Legal Principles Governing Writs of Mandate and*
*the Applicable Standard of Review*

A writ of mandate will issue to "compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station" (Code Civ. Proc., § 1085, subd. (a)), "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law" (Code Civ. Proc., § 1086). The writ will issue against a county, city, or other public body, or against a public officer. (*Housing Authority v. City of L. A.* (1952) 38 Cal.2d 853, 869-871; *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653.)

9

"In reviewing the trial court's denial of the writ, we must determine whether its findings and judgment are supported by substantial evidence. However, where the facts are undisputed and a question of law is involved, we may exercise our independent judgment." (*Riverside Sheriff's Assn. v. County of Riverside* (2003) 106 Cal.App.4th 1285, 1289.)

B.

*The Sheriff's Order Did Not Violate the MMBA.*

1.

*Overview of the Meet-and-confer Requirements of the MMBA*

"The MMBA applies to local government employees in California. [Citation.] 'The MMBA has two stated purposes: (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. (§ 3500.) To effect these goals the act gives local government employees the right to organize collectively and to be represented by employee organizations (§ 3502), and obligates employers to bargain with employee representatives about matters that fall within the "scope of representation" (§§ 3504.5, 3505).'" (*Claremont*, *supra*, 39 Cal.4th at p. 630, fn. omitted.)

Under the MMBA, a public employer and a recognized employee organization have a mutual obligation to meet in person and confer promptly upon either party's request in an endeavor to reach agreement on matters within the scope of representation before the public agency's adoption of its final budget for the coming year. (*International Assn. of Fire Fighters*, *supra*, 51 Cal.4th at p. 271; see § 3505.) The obligation to bargain in good faith requires that the parties "must genuinely seek to reach agreement." (*International Assn. of Fire Fighters*, *supra*, at p. 271.) The MMBA does not require that the parties actually reach an agreement. (*International Assn. of Fire Fighters*, *supra*, at p. 271.) "[A] public employer has the ultimate power to reject employee proposals on any particular issue." (*Ibid.*; see *Claremont*, *supra*, 39 Cal.4th at

10

p. 630 ["Even if the parties meet and confer, they are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue'"].)

Section 3504 defines the term "scope of representation" to include "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." The California Supreme Court has stated: "The definition of 'scope of representation' and its exceptions are 'arguably vague' and 'overlapping.' [Citations.] '"[W]ages, hours and working conditions," which, broadly read could encompass practically any conceivable bargaining proposal; and "merits, necessity or organization of any service" which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion.' [Citation.]" (*Claremont*, *supra*, 39 Cal.4th at p. 631.)[4]

In *Claremont*, *supra*, 39 Cal.4th at page 638, the California Supreme Court clarified a three-part test (the *Claremont* test) to determine whether an employer's action is subject to the meet-and-confer requirements of section 3505: "First, we ask whether

_____

[4] "To resolve ambiguities and uncertainties inherent in the MMBA's definition of the scope of representation, [the California Supreme C]ourt has looked to federal precedents. [The Supreme C]ourt has noted that the first key phrase in the MMBA's definition of the scope of representation—'wages, hours, and other terms and conditions of employment' (§ 3504)—was copied verbatim from the federal NLRA [(National Labor Relations Act)] (see 29 U.S.C. § 158(d)), while the other key phrase—'merits, necessity, or organization of any service' (§ 3504)—was intended to incorporate the '"general managerial policy"' exception developed by federal courts to determine the scope of representation under the NLRA. [Citations.]" (*International Assn. of Fire Fighters*, *supra*, 51 Cal.4th at p. 272, citing *Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 658, 663 and *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 616-617.)

11

the management action has 'a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees.' [Citation.] If not, there is no duty to meet and confer. [Citations.] Second, we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision. If not, then . . . the meet-and-confer requirement applies. [Citation.] Third, if both factors are present—if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees—we apply a balancing test. The action 'is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question.' [Citation.] In balancing the interests to determine whether parties must meet and confer over a certain matter [citation], a court may also consider whether the 'transactional cost of the bargaining process outweighs its value.'"

2.

*Application of the* Claremont *Test Shows the Sheriff's Order
Did Not Violate the MMBA.*

After applying the *Claremont* test to the Sheriff's order, the trial court concluded that the Sheriff's executive command ordering the withdrawal of preinvestigative interview access to the investigative file was not subject to the meet-and-confer requirements of the MMBA. For the reasons we will explain, the trial court reached the correct conclusion.

a.

*The Sheriff's order did not significantly and adversely affect wages,
hours, or working conditions within the meaning of the MMBA.*

As to the first part of the *Claremont* test, there is no evidence the Sheriff's order significantly and adversely affected wages or hours; the Association does not

12

contend otherwise. Instead, the Association argues the Sheriff's order substantially and adversely affects working conditions, thereby subjecting it to the MMBA's meet-and-confer requirements.

The MMBA does not define the phrase "other terms and conditions of employment." (§ 3504.) Courts have construed the phrase "wages, hours, and other terms and conditions of employment" to include the transfer of bargaining-unit work to nonunit employees, mandatory drug testing of employees, work shift changes, and the adoption of a disciplinary rule prohibiting use of public facilities for personal use. (*Claremont*, *supra*, 39 Cal.4th at p. 631.)

In *Long Beach Police Officer Assn. v. City of Long Beach* (1984) 156 Cal.App.3d 996, 998, the appellate court affirmed the judgment ordering the issuance of a peremptory writ of mandate prohibiting the Long Beach Police Department, among others, from denying its officers "a 'past practice' of consultation with a [union] representative or an attorney prior to making oral and written reports concerning incidents in which an officer was involved in a shooting." The appellate court held that because the parties' memorandum of understanding "specifically prohibit[ed] the reduction in 'consistently applied past practices' unless the parties mutually agreed to such reduction in writing 'prior to implemention[,]'" that practice "cannot be unilaterally terminated . . . and does not violate public policy." (*Ibid*.) Explaining that its holding did not violate public policy, the appellate court stated, inter alia: "When an officer uses his weapon, the circumstances are normally serious and life-threatening. The focus is clearly and directly upon the officer and the other participants of the incident. While the public concern for a timely revelation of facts in these circumstances is extremely important, it does not outweigh the *contractual* right of the officer to consult with an advisor prior to the preparation of a report, especially when the report could be incriminating and the decision to seek punitive or criminal action could in part be based upon such report. The

13

public concern cannot also outweigh the potential violations of the officer's *rights under the Fifth and Sixth Amendments*." (*Id.* at p. 1010, italics added.)

In *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2008) 166 Cal.App.4th 1625, 1628 (*ALADS*), the appellate court considered whether the Los Angeles County Sheriff's Department violated the MMBA by unilaterally implementing the following "anti-huddling policy revision": "'[P]rior to being interviewed by assigned Departmental investigators. . . . Members [of the Department] who were either involved in or witnessed [a deputy-involved shooting] may consult individually with legal counsel or labor representatives . . . [but] . . . shall not consult with legal counsel and or labor representatives *collectively or in groups* (e.g., two or more members consulting at the same time with the same legal counsel/labor representatives).'"

In *ALADS*, the plaintiff union alleged, "the right of the Department's deputies to huddle with counsel is a 'working condition' because it has been a 'consistent and established practice . . . for over 25 years.'" (*ALADS*, *supra*, 166 Cal.App.4th at p. 1643.) The appellate court, relying on *Long Beach Police Officer Assn. v. City of Long Beach*, *supra*, 156 Cal.App.3d 996, rejected the union's argument, stating: "The problem we see with [the union]'s argument is that it has not shown us any provision in the parties' MOU which defines 'working conditions' to include 'consistent and established practices.' For this reason, alone, [the union] has not shown that it is likely to prevail on its meet-and-confer claim under the MMBA." (*ALADS*, *supra*, at p. 1643.) The appellate court also noted the lack of any statutory support for the union's position, stating: "[S]ection 3303, subdivision (i), does not support the proposition that a right to huddle with counsel is a necessary component of a peace officer's working conditions. Section 3303, subdivision (i), provides that a 'public safety officer' has a right to be represented by legal counsel of 'his or her choice.' The right protected under

14

section 3303, subdivision (i), is an individual officer's right to counsel, and does not expressly protect a right to huddle in a group with counsel." (*Ibid.*)

Here, as in *ALADS*, the MOU neither prohibits a reduction of existing "'consistently applied past practices'" nor otherwise establishes that past practices constitute working conditions, triggering the meet-and-confer requirements of the MMBA. (*Long Beach Police Officer Assn. v. City of Long Beach*, *supra*, 156 Cal.App.3d at p. 998). Furthermore, the provision of preinvestigative interview access to the investigative file is not supported by statute or public policy.

In *Pasadena*, *supra*, 51 Cal.3d at page 569, the California Supreme Court held that section 3303 (contained in the Public Safety Officers Procedural Bill of Rights Act, § 3300 et seq.) does not manifest "a legislative intent to grant preinterrogation discovery rights to a peace officer who is the subject of an internal affairs investigation." The California Supreme Court explained: "To keep the peace and enforce the law, a police department needs the confidence and cooperation of the community it serves. Even if not criminal in nature, acts of a police officer that tend to impair the public's trust in its police department can be harmful to the department's efficiency and morale. Thus, when allegations of officer misconduct are raised, it is essential that the department conduct a prompt, thorough, and fair investigation. Nothing can more swiftly destroy the community's confidence in its police force than its perception that concerns raised about an officer's honesty or integrity will go unheeded or will lead only to a superficial investigation." (*Pasadena*, *supra*, at p. 568.)

In *Pasadena*, *supra*, 51 Cal.3d at page 578, the California Supreme Court explained its reasoning: "Unlike other protections set forth in the [Public Safety Officers Procedural Bill of Rights ]Act, a right to preinterrogation discovery is not essential to the fundamental fairness of an internal affairs investigation. Indeed, *the right to discovery before interrogation and before charges have been filed*, as [the union] seeks here, *is without precedent*." (Some italics added.) The court stated, "granting discovery before

15

interrogation could frustrate the effectiveness of any investigation, whether criminal or administrative. Underlying every administrative inquiry into suspected officer misconduct is the obligation of the law enforcement agency to assure public confidence in the integrity of its officers. The purpose of the inquiry is to determine whether there is any truth to the allegations of misconduct made against an officer and, if so, whether to commence disciplinary proceedings. . . . [¶] Disclosure before interrogation might color the recollection of the person to be questioned or lead that person to conform his or her version of an event to that given by witnesses already questioned. . . . [¶] Furthermore, to require disclosure of crucial information about an ongoing investigation to its subject before interrogation would be contrary to sound investigative practices. During an interrogation, investigators might want to use some of the information they have amassed to aid in eliciting truthful statements from the person they are questioning. Mandatory preinterrogation discovery would deprive investigators of this potentially effective tool and impair the reliability of the investigation. This is true in any interrogation, whether its purpose is to ferret out criminal culpability or, as in this case, to determine if a peace officer used a mailing list in contravention of a direct order by his superiors." (*Id.* at pp. 578-579.)[5]

Notwithstanding the above cited authorities, the Association argues in its opening brief: "The meet and confer requirement extends to changes in existing and acknowledged practices, even if, as in this instance, they are not formalized in a written agreement or rule." The Association's assertion is correct only to the extent that the past practice in question significantly and adversely affects wages, hours, or other terms and

---

[5] The Supreme Court acknowledged that the union had "alleged that the Department had a practice of preinterrogation disclosure." (*Pasadena*, *supra*, 51 Cal.3d at p. 580.) The Supreme Court stated that because the trial court had not yet resolved that issue, "[w]e need not determine whether the Department did have such a practice" and whether an officer was entitled to preinterrogation access to certain notes taken during a different interview. (*Ibid.*)

16

conditions of employment, as confirmed by the cases cited by the Association in support of its argument. (See *San Francisco Fire Fighters Local 798 v. Board of Supervisors* (1992) 3 Cal.App.4th 1482, 1491 ["The fire commission's decision changed the accepted practice under which employees expected to be promoted. Consequently, there is no question the decision affected the 'terms and conditions of employment'"]; *International Assn. of Fire Fighters Union v. City of Pleasanton* (1976) 56 Cal.App.3d 959, 971-973 [analyzing amendment relative to probationary employees' eligibility for merit pay increases]; *Solano County Employees' Assn. v. County of Solano* (1982) 136 Cal.App.3d 256, 265 [county's refusal to continue to permit employees to use their motorcycles at work is a meet-and-confer item]; *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 817 [imposition of disciplinary rule prohibiting long-standing practice that allowed firefighters to use city facilities to wash their private automobiles during off-duty time].)[6] The Association does not cite any legal authority, and we have found none, supporting the argument that *any* long-standing past practice necessarily constitutes a working condition within the meaning of the MMBA.

Here, the Sheriff's order did not infringe on any statutory rights or affect any issue addressed in the MOU. In light of the foregoing evidence and relevant legal authorities, the Sheriff's order implementing the withdrawal of preinvestigative interview access to the investigative file did not significantly and adversely affect wages, hours, or working conditions within the meaning of the MMBA. Therefore, defendants did not

---

[6] The Association also cites several federal circuit court cases and National Labor Relations Board cases in support of its argument, all of which are readily distinguishable from the instant case because the past practices at issue in those cases clearly impacted wages, hours, or other terms and conditions of employment. (See, e.g., *Rahco, Inc.* (1982) 265 NLRB 235, 256-257 [imposition of new written warnings and discipline system constituted a significant change in the employees' working conditions as it materially and substantially affected job security and thus was a mandatory subject of bargaining].)

violate the MMBA by failing to meet and confer on that issue before implementing the change in practice.

b.

*Even if the Sheriff's order significantly and adversely affected working conditions within the meaning of the MMBA, it constituted the implementation of a fundamental managerial or policy decision.*

In *International Assn. of Fire Fighters*, *supra*, 51 Cal.4th at page 273, the California Supreme Court reiterated the second and third parts of the *Claremont* test in its analysis of "management decisions that directly affect employment, such as eliminating jobs, but nonetheless may not be mandatory subjects of bargaining because they involve 'a change in the scope and direction of the enterprise' or, in other words, the employer's 'retained freedom to manage its affairs unrelated to employment.'" The Supreme Court held: "Bargaining is not required for decisions in this category if they do not raise an issue that is 'amendable to resolution through the bargaining process' [citation], although the employer is normally required to bargain about the results or effects of such decisions [citation]. To determine whether a particular decision in this third category is within the scope of representation, the [United States Supreme C]ourt prescribed a balancing test, under which 'in view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.' [Citation.]" (*Ibid.*)

In *ALADS*, *supra*, 166 Cal.App.4th at pages 1643-1644, the appellate court held that even assuming the anti-huddling policy revision at issue significantly and adversely affected working conditions within the meaning of the MMBA, that policy revision arose from the implementation of a fundamental managerial or policy decision, and thus was outside the meet-and-confer requirements of the MMBA. The appellate

18

court explained: "Section 3504 of the MMBA incorporates the principle developed in federal law that employers have a right to make unconstrained decisions when fundamental management or policy choices are involved." (*ALADS*, *supra*, at p. 1644.)

Here, the withdrawal of preinvestigative interview access to the investigative file was ordered "to ensure the integrity and reliability of future internal affairs investigations" and to bring the Department in line with what is considered to be the "best practice" in conducting internal affairs investigations. The change in practice implemented by the Sheriff's order, therefore, squarely falls into the third part of management decisions described in *International Assn. of Fire Fighters*, *supra*, 51 Cal.4th at page 273, as it constitutes a fundamental managerial decision, falling within the Department's "'freedom to manage its affairs unrelated to employment'" (*ibid*). The Association does not identify any results from, or effects of, the Sheriff's order, which are subject to bargaining.

c.

*The Sheriff's need to withdraw preinvestigative interview access to the investigative file is not outweighed by the benefit to employer-employee relations of bargaining about that change in practice.*

Even were we to assume the Sheriff's order constituted a fundamental managerial or policy decision that significantly and adversely affected working conditions, the Sheriff's need for unencumbered decisionmaking to ensure the integrity of the Department's internal affairs investigations of alleged misconduct is not outweighed "'by the benefit to employer-employee relations of bargaining about the action in question'" (*Claremont*, *supra*, 39 Cal.4th at p. 638) for the reasons set forth in *Pasadena*, *supra*, 51 Cal.3d 564, as discussed *ante*.

In *ALADS*, *supra*, 166 Cal.App.4th at page 1644, the appellate court similarly concluded: "Is the Department's need for unencumbered decisionmaking in managing its operations outweighed by the benefit to employer-employee relations of

19

bargaining about the action in question? . . . [W]e answer this question 'no.' The deputies' working condition claim is tenuous, and the Department's interest in public accountability is significant on its face."

In light of the foregoing, the Sheriff's order withdrawing preinvestigative interview access to the investigative file was not subject to the meet-and-confer requirements of the MMBA.

C.

*The Sheriff's Order Did Not Constitute a Breach of the MOU.*

The petition also asserted the Sheriff's order violated certain terms of the MOU. For reasons we will explain, the trial court did not err by rejecting this argument.

1.

*Applicable Legal Principles and Standard of Review*

"The MOU, entered into between the county and the [union] on behalf of employees . . . , is 'a mutually agreed covenant, a labor management contract. . . . [¶] . . . [A]ll modern California decisions treat labor-management agreements . . . as enforceable contracts [citation] which should be interpreted to execute the mutual intent and purpose of the parties.' [Citation.] '"Thus, '"[w]e are free to make our own independent interpretation of the terms of the contract and its application to the instant dispute."'"'" (*Riverside Sheriffs' Assn. v. County of Riverside* (2009) 173 Cal.App.4th 1410, 1424.) "'[B]ecause we must interpret the MOU to "'execute the *mutual* intent and purpose of the parties[,]'" we independently review the appellate record. [Citation.]'" (*Ibid.*) We independently interpret a contract, such as the MOU, where the interpretation does not turn on the credibility of extrinsic evidence. (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 70-71.)

20

## 2.

### *The Trial Court's Findings*

In its minute order denying the petition, the trial court set forth its factual findings and its detailed, well-reasoned analysis rejecting the Association's argument that the Sheriff's order violated the MOU. Particularly pertinent excerpts from the minute order are:

"[The Association] contends that the past practice of 'pre-interview access' was part of the MOU, and that unilaterally withdrawing the past practice is a breach of the agreement. The MOU says nothing about 'pre-interview access' and nothing about incorporating past practices, except to the extent it preserves [defendants'] pre-existing rights and powers. . . . [The Association] contends that the silence is of no consequence since 'pre-interview access' is an 'implied' term of the MOU.

"MOUs are contracts, and ordinarily the existence of implied terms turns on the scope of any integration clause. Here, the MOU does not contain an integration clause, but where parties execute a written agreement, that agreement is at least partially integrated to the extent new or different terms are sought to be incorporated therein. [Citation.] There is nothing in the MOU to suggest any intention to incorporate implied terms or past practices. [Citations.] Moreover, the MOU does make some tangential reference to investigative rights:

"—Article III, Sec. 3 (PO-24), giving an employee the right to review 'adverse statements' and 'reports concerning criminal investigations' before they are made part of the employee's personnel file.

"—Article IX, Sec. 2 (PO-57), enumerating the information which must be provided to an employee prior to a disciplinary hearing (but nothing regarding an investigation).

"The inclusion of these particular rights suggests that the exclusion of 'pre-interview access' was intentional. [Citation.] If the [Association] intended to

21

perpetuate the 'pre-interview access' policy as a condition precedent to any investigative interview, either Article III or IX would have been a logical place to insert a reference to such policy. In fact, [the Association] admits that this very topic was discussed but was unresolved during negotiations for the 2003-2006 MOU . . . ; therefore its absence from any MOU (much less the operative 2009-2012 MOU) is telling, particularly given the California Supreme Court's holding in *Pasadena Police Officers Assn vs. City of Pasadena* (1990) . . . 51 Cal.3d 564 that peace officers have no statutory right to 'pre-interview access' or other advance discovery. Under the circumstances, 'pre-interview access' would not naturally have been excluded from the MOU [citation], and is not reasonably susceptible to any of the written terms. Even though it was not completely at variance with an express term [citation], 'pre-interview access' appears to have been a term which the parties specifically agreed to disagree on. Thus, absent a meeting of the minds it cannot now become an enforceable term in the agreement."

In the minute order, the trial court rejected the Association's contention that "past practices are, by law, incorporated as implied terms of an MOU," as being without support of legal authority. The court also rejected the Association's contention that "the 'zipper clause' in the MOU (Article XXIII) obligates [defendants] to meet and confer over the 'pre-interview access' policy change."[7]

The trial court stated, "[a] zipper clause is frequently found in labor agreements and is intended to 'close out bargaining during the contract term and to make the written contract the exclusive statement of the parties' rights and obligations,'" but

---

[7] The so-called zipper clause in article XXIII of the MOU is entitled "MODIFICATION AND WAIVER" (underscoring omitted) and states in its entirety: "Except as specifically provided herein, it is agreed and understood that the parties hereto reserve the right, only upon mutual agreement, to negotiate with respect to any subject or matter covered herein or with respect to any other matter within the scope of representation during the term of the Memorandum of Understanding."

22

"[n]ot all zipper clauses are created equal."[8]  The court stated that in the instant case, the zipper clause contained in the MOU "is poorly constructed.  It preserves a 'right' to negotiate matters within the MOU, whereas zipper clauses are supposed to 'zip up' and bring to an end negotiations.  It conditions that 'right' on the mutual agreement of the parties, which is essentially saying that if both sides agree, terms of the agreement can be modified.  Every contractual relationship can be adjusted if the contracting parties so decide.  The zipper clause is silent as to past practices and does not define what is within the 'scope' of representation.  It would have been easy to make clear that the scope is co-extensive with the MMBA (i.e. wages, hours and working conditions), but does not incorporate past practices as implied terms."

Finally, the court stated it found "no evidence was presented from which it can be concluded that 'pre-interview access' or any past practice was intended to be a part of the MOU."

3.

*The Trial Court Did Not Err in Finding No Breach of the MOU.*

The Association does not challenge any of the trial court's factual findings or legal reasoning supporting its conclusion the MOU had not been breached.  The Association does not dispute that the MOU is silent regarding the Department's former preinvestigative interview access practice.

In its opening brief, the Association argues that because providing preinvestigative interview access to the investigative file had been a "long standing past practice" of the Department, that practice "r[ose] to the level of an implied term of the

---

[8]  "'[T]he general purpose of a zipper clause is to "zip up" the collective bargaining agreement.  It insulates both parties to the agreement from a demand by the other party to reopen negotiations with the intent of modifying or adding to the current contract terms or otherwise changing the status quo.'"  (*City of Fresno v. People ex rel. Fresno Firefighters* (1999) 71 Cal.App.4th 82, 98.)

MOU," as a matter of law, and by implementing the change in practice, defendants breached the MOU's zipper clause. The Association's argument mirrors its argument, addressed *ante*, that any long-standing past practice constitutes a working condition within the meaning of the MMBA.

The Association has failed to cite any legal authority, and we have found none, showing that any "long standing past practice," regardless of its nature, becomes an implied term of the MOU, as a matter of law. The Association's position finds no support in statutes, case law, public policy, or the language of the MOU itself.

## II.

### THE TRIAL COURT DID NOT ERR BY DENYING THE ASSOCIATION'S REQUEST FOR A PRELIMINARY INJUNCTION.

"'Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. [Citations.]' [Citation.] 'A trial court may not grant a preliminary injunction, regardless of the balance of interim harm, unless there is some possibility that the plaintiff would ultimately prevail on the merits of the claim. [Citation.]' [Citation.]" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999; see *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450.)

Here, the trial court denied the Association's request for a preliminary injunction on the ground, inter alia, that the Association failed to show a likelihood of success on the merits. The Association contends it had demonstrated a likelihood of success on the merits for the same reasons it relied upon in arguing the trial court erred by failing to grant the petition. For the reasons discussed *ante*, the petition was without merit. We therefore find no error in the trial court's denial of a preliminary injunction.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover costs on appeal.



FYBEL, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


ARONSON, J.