Filed 6/29/16  Riverside Sheriffs' Assn. v. County of Riverside CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| RIVERSIDE SHERIFFS' ASSOCIATION, | |
| Plaintiff and Appellant, | E062836 |
| v. | (Super.Ct.No. RIC1312375) |
| COUNTY OF RIVERSIDE et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County.  Sharon J. Waters, Judge.
Affirmed.

Stone Busailah, Michael P. Stone, Muna Busailah and Robert Rabe for Plaintiff
and Appellant.

The Zappia Law Firm, Edward P. Zappia, Brett M. Ehman and Gail E. Wise for
Defendants and Respondents.

1

The Riverside County Sheriff's Department (the Department) had a policy regulating its employees' outside employment activities (the policy), i.e., additional employment outside of the Department. In November 2010, the Department revised the policy. Those revisions caused the policy to be "changed significantly."

In November 2013, the Riverside Sheriffs' Association (the Association) petitioned the trial court for a writ of mandate (Code Civ. Proc., § 1085) ordering the Department to revert to the pre-2010 version of the policy, until the Department engaged in collective bargaining with the Association regarding the policy revisions, and the parties reached an agreement concerning the policy revisions. The trial court denied the Association's writ petition.

On appeal, the Association contends collective bargaining is required because (a) the policy revisions significantly and adversely affected the Association's members' terms and conditions of employment, and (b) the policy revisions are not a fundamental managerial decision. Alternatively, if the policy revisions are a fundamental managerial decision, then the impact and effects of the policy revisions are subject to bargaining. The Association also asserts collective bargaining is required pursuant to Government Code section 1126.[1] We affirm the judgment.

---

[1] All subsequent statutory references will be to the Government Code unless otherwise indicated.

2

**FACTUAL AND PROCEDURAL HISTORY**

A.    PRIOR POLICIES

The Department had an outside employment policy that was issued in June 1994. In January 2001, the outside employment policy was amended. In 2001, the policy provided, in relevant part, full-time employees must have Department approval for outside employment. It also reflected approval may be denied or withdrawn if (a) the employee's performance evaluation reflects they are less than competent, or if the outside job might impair the employee's efficiency when working at the Department; (b) the outside employment would cause the employee to work in excess of six hours when the employee is already scheduled for an eight-hour shift at the Department; or (c) the outside employment requires the employee to make use of Department equipment, uniform, or identification.

The 2001 policy also provided the procedure by which employees were to seek approval of their outside employment. Employees needed to submit a completed application form "through their chain of command to their Division Chief Deputy" "for approval or disapproval." The employee could not commence outside employment until receiving approval. The employee was required to reapply for approval "any time the conditions of the outside employment activities change from that described in the initial request." An employee would be subject to discipline for engaging in outside employment without prior Department approval.

3

B.     2010 POLICY

In November 2010, the Department revised the outside employment policy.  A memo concerning the revision was sent to all personnel and reflected the policy had "changed significantly."  The 2010 policy set forth a definition of outside employment.  It required an employee to obtain approval from the Department prior to commencing outside employment.  The failure to obtain preapproval could lead to discipline.  In order to obtain approval, an employee needed to complete an application, give the application to the employee's supervisor, which would "then be forwarded through the chain of command to the division chief for consideration."  Employees still needed to resubmit an application "any time the conditions of the outside employment activities change from that described in the initial request."  Additionally, (1) employees were now required to obtain "annual approval for continuing outside employment," and (2) employees approved for outside employment were considered to have agreed "that their personal financial records may be requested and reviewed/audited for [a] potential conflict of interest pursuant to Government Code Section 3308."

The 2010 policy revisions set forth an appeal process should an application for outside employment be denied.  The policy also explained that permission for outside employment "may be revoked or suspended" (1) when the employee's work at the Department is evaluated by a supervisor as being "unsatisfactory" or "below standard," (2) as a "condition of sustained discipline," (3) when the employee's conduct or outside employment conflicts with the Department's policies, or (4) when the employee "is unable to perform at a 'full duty' capacity due to an injury or other condition."

4

The 2010 policy revisions explained activities that would be forbidden as outside employment, such as those requiring the use of Department facilities, equipment, uniform, or badge. The policy prohibited employees from working as "a private security guard, private investigator or other similar private security position." However, the policy set forth procedures for private entities seeking outside security services from Department employees. In such a situation, the private entity would need to apply to the Department for the outside services. If the request were to be approved, then (1) the employees would have to wear their Department uniforms, (2) compensation for such outside security services would be "pursuant to normal overtime procedures," and (3) such services would not be subject to collective bargaining. Further, any arrest made by an employee during the employee's outside overtime assignment would still need to comply with the Department's timelines regarding completing reports, and that time spent on such reports "shall be considered incidental to the outside overtime assignment."

The policy also provided that an employee must notify the Department if the employee terminates his or her outside employment. Also, the policy indicated employees cannot engage in outside employment while using routine sick leave. If an employee is on disability leave or modified/light duty, then that employee must notify his supervisor in writing of whether or not he plans to continue his outside employment while on leave or light duty status. The immediate supervisor will then make a recommendation to the Sheriff as to whether such outside employment should continue. If the Sheriff determines the outside employment should be discontinued, or if the

employee fails to notify his supervisor of his intent regarding outside employment, then a "notice of revocation of the member's permit" will be sent to the employee.

C. LETTER

In January 2011, the Association sent a letter to the Riverside County Director of Employee Relations. In the letter, the Association demanded Riverside County (the County) "comply with the meet-and-confer requirements of the Meyers-Milias-Brown Act ('MMBA'), Government Code §§ 3500-3511."[2] The Association noted the MMBA requires the County to meet and confer with the Association on issues of wages, hours, and other terms and conditions of employment. The Association asserted the Department violated the MMBA by unilaterally revising the policy in 2010 without first meeting and conferring with the Association. The Association demanded the County (1) rescind the 2010 revisions to the policy and (2) meet and confer with the Association regarding the 2010 revisions to the policy prior to implementing any revisions. The Association notified the County that a failure to comply with the MMBA would result in the initiation of litigation, possibly including a petition for writ of mandate.

D. PETITION FOR WRIT OF MANDATE

On November 1, 2013, the Association petitioned the trial court for a writ of mandate. In the petition, the Association asserted the Department, in implementing the

---

[2] The Meyers-Milias-Brown Act (MMBA) "governs labor-management relations at the local government level." (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 628 (*Claremont*).)

6

2010 revisions, unilaterally created "a change in working conditions, to wit: no longer following the long standing policy and practice of allowing [Association] members to acquire and maintain secondary employment, [the Department has] acted to interfere with, intimidate, restrain, and coerce its members for the exercise of their right under Government Code [section] 3502, in that people viewing this situation will believe that [the Association] is not able to exercise its right to represent its members in their employment relations with [the Department]."

The Association requested a writ of mandate ordering the Department "not to change its policy and practice of allowing [the Association's] members to acquire and maintain secondary employment, absent agreement to do so as part of the collective bargaining process."

In the Association's Points and Authorities in Support of the petition, the Association explained that an April 2008 Memorandum of Understanding (MOU) between the Association and the Department contains a "zipper clause." The zipper clause provides that, during the term of the agreement (April 2008 through January 2011), "the parties may meet and confer on issues within the scope of representation only if they mutually agree to do so." The zipper clause is meant to "bring[] closure to the bargaining process," such that neither party changes the terms of the agreement during the agreement's effective period.

The Association asserted that allowing employees to maintain outside employment was such a longstanding Department policy that it constitutes "an implied condition of employment." The Association argued that the Department's decision to

7

"depart from this policy and practice" without "indicat[ing] a willingness to meet and confer" constitutes a deprivation of the Association's "right to collective bargaining guaranteed in the MMBA and . . . a breach of the current MOU."

E.    DEMURRER

The Department demurred to the writ petition. First, the Department asserted the Association had six months to file an unfair labor practices charge under the MMBA, and because the Association waited three years to file its petition, the petition was untimely. Second, the Department asserted section 1126 mandated the policy (1) be adopted, and (2) excluded from collective bargaining.[3] Third, the Department

---

[3] Section 1126 provides: "(a) Except as provided in Sections 1128 and 1129, a local agency officer or employee shall not engage in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee or with the duties, functions, or responsibilities of his or her appointing power or the agency by which he or she is employed. The officer or employee shall not perform any work, service, or counsel for compensation outside of his or her local agency employment where any part of his or her efforts will be subject to approval by any other officer, employee, board, or commission of his or her employing body, unless otherwise approved in the manner prescribed by subdivision (b).

"(b) Each appointing power may determine, subject to approval of the local agency, and consistent with the provisions of Section 1128 where applicable, those outside activities which, for employees under its jurisdiction, are inconsistent with, incompatible to, or in conflict with their duties as local agency officers or employees. An employee's outside employment, activity, or enterprise may be prohibited if it: (1) involves the use for private gain or advantage of his or her local agency time, facilities, equipment and supplies; or the badge, uniform, prestige, or influence of his or her local agency office or employment or, (2) involves receipt or acceptance by the officer or employee of any money or other consideration from anyone other than his or her local agency for the performance of an act which the officer or employee, if not performing such act, would be required or expected to render in the regular course or hours of his or her local agency employment or as a part of his or her duties as a local agency officer or employee or, (3) involves the performance of an act in other than his

*[footnote continued on next page]*

8

contended "[o]utside employment policies are not within the scope of representation as defined by the MMBA," and, therefore, the Department is not obligated to meet and confer about the policy revisions.

F.      OPPOSITION TO THE DEMURRER

The Association opposed the demurrer.  The Association asserted there is a three-year statute of limitations for filing an unfair labor practices petition under the MMBA.  In response to the Department's reliance on section 1126, the Association asserted there is a parallel statute, section 19990, which also concerns conflicts of interest.[4]  The Association asserted case law and administrative law concerning section

---

*[footnote continued from previous page]*
or her capacity as a local agency officer or employee which act may later be subject directly or indirectly to the control, inspection, review, audit, or enforcement of any other officer or employee or the agency by which he or she is employed, or (4) involves the time demands as would render performance of his or her duties as a local agency officer or employee less efficient.

"(c)  The local agency shall adopt rules governing the application of this section. The rules shall include provision for notice to employees of the determination of prohibited activities, of disciplinary action to be taken against employees for engaging in prohibited activities, and for appeal by employees from such a determination and from its application to an employee.  Nothing in this section is intended to abridge or otherwise restrict the rights of public employees under Chapter 9.5 (commencing with Section 3201) of Title 1.

"(d)  The application of this section to determine what outside activities of employees are inconsistent with, incompatible with, or in conflict with their duties as local agency officers or employees may not be used as part of the determination of compensation in a collective bargaining agreement with public employees."

[4]  Section 19990 provides:  "A state officer or employee shall not engage in any employment, activity, or enterprise which is clearly inconsistent, incompatible, in conflict with, or inimical to his or her duties as a state officer or employee.

"Each appointing power shall determine, subject to approval of the department, those activities which, for employees under its jurisdiction, are inconsistent,

*[footnote continued on next page]*

9

19990 reflect that policies concerning employees' conflicts of interest or incompatible

---

*[footnote continued from previous page]*

incompatible or in conflict with their duties as state officers or employees. Activities and enterprises deemed to fall in these categories shall include, but not be limited to, all of the following:

"(a) Using the prestige or influence of the state or the appointing authority for the officer's or employee's private gain or advantage or the private gain of another.

"(b) Using state time, facilities, equipment, or supplies for private gain or advantage.

"(c) Using, or having access to, confidential information available by virtue of state employment for private gain or advantage or providing confidential information to persons to whom issuance of this information has not been authorized.

"(d) Receiving or accepting money or any other consideration from anyone other than the state for the performance of his or her duties as a state officer or employee.

"(e) Performance of an act in other than his or her capacity as a state officer or employee knowing that the act may later be subject, directly or indirectly to the control, inspection, review, audit, or enforcement by the officer or employee.

"(f) Receiving or accepting, directly or indirectly, any gift, including money, or any service, gratuity, favor, entertainment, hospitality, loan, or any other thing of value from anyone who is doing or is seeking to do business of any kind with the officer's or employee's appointing authority or whose activities are regulated or controlled by the appointing authority under circumstances from which it reasonably could be substantiated that the gift was intended to influence the officer or employee in his or her official duties or was intended as a reward for any official actions performed by the officer or employee.

"(g) Subject to any other laws, rules, or regulations as pertain thereto, not devoting his or her full time, attention, and efforts to his or her state office or employment during his or her hours of duty as a state officer or employee.

"The department shall adopt rules governing the application of this section. The rules shall include provision for notice to employees prior to the determination of proscribed activities and for appeal by employees from such a determination and from its application to an employee. Until the department adopts rules governing the application of this section, as amended in the 1985-86 Regular Session of the Legislature, existing procedures shall remain in full force and effect.

"If the provisions of this section are in conflict with the provisions of a memorandum of understanding reached pursuant to Section 3517.5, the memorandum of understanding shall be controlling without further legislative action, except that if such provisions of a memorandum of understanding require the expenditure of funds, the provisions shall not become effective unless approved by the Legislature in the annual Budget Act."

activities are within the scope of representation, i.e., within the scope of collective bargaining. The Association argued that section 1126 should be interpreted consistently with section 19990 and, therefore, the subject matter of section 1126, i.e., conflicts of interest, is within the scope of collective bargaining.

The Association argued section 1126 does not prohibit collective bargaining. Section 1126, subdivision (d), provides: "The application of this section to determine what outside activities of employees are inconsistent with, incompatible with, or in conflict with their duties as local agency officers or employees may not be used as part of the determination of compensation in a collective bargaining agreement with public employees."

The Association asserted the plain meaning of section 1126, subdivision (d), is that "it prohibits using outside activities, i.e., 'off duty employment,' as part of the process to determine compensation during collective bargaining." In particular, it restricts agencies "from 'using off-duty employment as a bargaining tool' as part of the 'determination of compensation.'" The Association asserted subdivision (d) did not prevent collective bargaining over the determination of what outside activities would be in conflict with the employees' duties.

G.      REPLY TO OPPOSITION

The Department filed a reply to the Association's opposition. The Department asserted section 1126 applies to local agencies, while section 19990 applies to state agencies and, therefore, section 19990 is inapplicable in this case. The Department

11

contended the Association ignored differences between the two statutes that would cause section 1126 conflict of interest issues not to fall within collective bargaining.

H.    DEMURRER RULING

The trial court, in particular Judge Molloy, overruled the Department's demurrer. At the hearing on the demurrer, the trial court concluded (1) a three-year statute of limitations applies, and (2) the Legislature included the language about barring collective bargaining in section 1126 because it wanted to prevent outside employment "from being used as a bargaining chip. . . [¶] [t]o bargain a better deal for the County in terms of, okay, we're not going to let you engage in these outside practices unless you accept our deal on just compensation."

I.    ANSWER

The Department filed an answer to the Association's writ petition.  In the answer, the Department alleged the Association (1) failed to state facts sufficient to constitute a cause of action and (2) failed to comply with filing requirements.

J.    PREEMPTORY WRIT

The Association petitioned the trial court for a preemptory writ of mandate ordering the Department to rescind the 2010 policy revisions and to cease and desist from changing the outside employment policy unless the Department complied with the MMBA.  The Association raised essentially the same arguments that were raised in opposition to the demurrer:  (1) section 19990, which concerns conflicts of interest on a state level and policies related to those issues have been determined to be subject to collective bargaining; (2) section 1126, which concerns local agency conflicts of

interest, is modeled on section 19990; and (3) section 1126 should be interpreted in accordance with section 19990.

The Department opposed the petition for a preemptory writ of mandate relying on the same arguments it raised in its demurrer: (1) section 1126 is distinguishable from section 19990; (2) the express language and legislative history of section 1126 reflects collective bargaining is prohibited; and (3) the MOU excludes the outside employment policy from collective bargaining.

The trial court denied the petition for a preemptory writ of mandate.

K.    TENTATIVE RULING

The trial court issued a seven-page tentative ruling. In the tentative ruling, the trial court, in particular Judge Waters, concluded (1) although the Association failed to explain how the policy affects "wages, hours, and other terms and conditions of employment" such that it would fall within the scope of collective bargaining, it was "apparent" that some of the 2010 revisions to the policy affect conditions of employment; (2) section 1126, subdivision (d), precludes collective bargaining over outside employment in connection with determining compensation, but it may still be part of the collective bargaining process in terms of negotiating hours and conditions of employment; and (3) the "zipper clause" in the MOU does not give the Department the authority to make unilateral changes to the status quo.

The trial court also considered whether the policy amendments were a managerial function and, therefore, subject to the meet-and-confer process. The trial court found the Association failed to address the issue, and the Department

13

"oversimplif[ied]" the issue. The trial court explained that neither party's argument took into account that there is a distinction to be made "between deciding on the policy, and the implementation and effects of that decision. Even if the policy decision itself is not subject to a duty to meet and confer, the implementation of the policy may well be." The trial court observed that the parties "have made this into an all or nothing position—either the entire policy is subject to meet and confer, or none of it is." The court tentatively decided that it would require further briefing from the parties.

L.      SEPTEMBER HEARING

On September 26, 2014, the trial court held a hearing on the writ petition. The trial court explained, "I'm not seeing this necessarily as an all or nothing. Either every aspect related to the outside employment is exempt from bargaining, or all of it has to be bargained."

The Association argued that supplemental briefing was not necessary because the administrative cases interpreting section 19990 reflect the issue of outside employment is subject to collective bargaining; because section 1126 is very similar to section 19990, the 2010 policy revision, which is based on section 1126, is subject to collective bargaining.

The Department also argued that supplemental briefing was not necessary. First, the Department asserted the outside employment policy had never been a topic at past collective bargaining negotiations and, therefore, "[i]t's a [D]epartment policy," which means it is "a management policy, not a negotiated term." The Department argued that the Association's failure to argue the managerial function issue in its petition was a

14

failure of the Association to meet its burden of proof and, therefore, the writ should be denied. The Department argued that the Association failed to ask for partial relief or that only the effects of the policy should be bargained for. The Department asserted that the Association's failure to ask for partial relief precluded the trial court from granting such relief.

Second, the Department asserted the Association was "relying on an irrefutably inapplicable statute." The Department further argued that the Association was relying on administrative law decisions issued by the Public Employment Relations Board (PERB), but law enforcement is exempt from PERB, which is why the instant case was in court rather than at PERB. Additionally, the Department asserted section 1126, subdivision (d), expressly exempted the 2010 policy revisions from being part of the collective bargaining negotiations.

The trial court stated supplemental briefing would not be granted and took the matter under submission.

M.    OCTOBER HEARING

On October 27, 2014, the trial court held another hearing in the matter because the Department had changed its proposed judgment. The trial court explained that the original proposed judgment was a simple denial, while the second proposed judgment "has a lot more in there than certainly [the trial court] even contemplated."

The court continued, "I'll tell you both, after you rejected my very generous offer to allow both of you to do more briefing and you both insisted that from your perspective the briefing was adequate, I looked at the petitioner's argument which was

15

based solely and exclusively on Government Code, section 19990 and a PERB case and concluded that the statute and case [are] inapplicable because of the suppression issue. [¶] I didn't go to any of the issues raised in the County's response. You know, you wanted a ruling based on the briefing, petitioner had the burden. Petitioner presented only one argument, and I rejected that argument."

The Department explained it did not understand the trial court's rationale when it drafted the second proposed judgment. The trial court instructed the Department to submit a proposed judgment that was a simple denial. The trial court explained, "It's a legal issue and almost doesn't matter why I ruled. If you're going to go up to the Court of Appeal, they are going to come to their own understanding." The trial court denied the Association's petition for writ of mandate.

## DISCUSSION

### A.    WRIT OF MANDATE

As a threshold issue, the Department contends its decision to revise the outside employment policy was discretionary, rather than ministerial and, therefore, the policy revisions are not the proper subject for a writ of mandate.

A court may issue a writ of mandate to an agency to compel the performance of an act that the law requires to be performed. (Code Civ. Proc., § 1085, subd. (a); *Gomez v. Superior Court* (2012) 54 Cal.4th 293, 300-301.) "'To obtain writ relief under Code of Civil Procedure section 1085, the petitioner must show there is no other plain, speedy, and adequate remedy; the respondent has a clear, present, and ministerial duty to act in a particular way; and the petitioner has a clear, present and beneficial

16

right to performance of that duty.'" (*Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 305.)

"'""A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment."'" (*US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 138.)

In the Association's petition, it seeks a writ ordering the Department "not to change its policy and practice of allowing [Association] members to acquire and maintain secondary employment, absent agreement to do so as part of the collective bargaining process." The Association's request reflects options. The Department can choose to (1) change the policy, if it engages in collective bargaining; or (2) not change the policy. Options do not correlate with a writ of mandate because mandate applies when the petition seeks to compel a ministerial, not discretionary, act. (*US Ecology, Inc. v. State of California*, *supra*, 92 Cal.App.4th at p. 138; *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1001.)

In order to remedy this problem, we will construe the Association's petition as seeking only to have the 2010 policy revision rescinded, because the revision violates the law. In other words, we will focus on what has happened in the past, as opposed to what may occur in the future. With this understanding, the Association is only seeking

17

to have the revisions to the policy rescinded, which would be a ministerial action and, therefore, the proper subject of a writ of mandate.

B.    STANDARD OF REVIEW

"In reviewing a judgment on a petition for writ of mandate under Code of Civil Procedure section 1085, we apply the substantial evidence test in assessing the court's factual findings but exercise independent judgment on purely legal issues such as the interpretation of statutes." (*Rivero v. Lake County Bd. of Supervisors* (2014) 232 Cal.App.4th 1187, 1193-1194.)

C.    WAGE, HOURS, AND WORKING CONDITIONS

1.    *CONTENTION*

In the Association's writ petition, it asserts the 2010 policy revisions must be rescinded because the Department imposed the revisions unilaterally.

2.    *COLLECTIVE BARGAINING LAW*

"'The MMBA applies to local government employees in California. [Citation.] "The MMBA has two stated purposes: (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. (§ 3500.) To effect these goals the act gives local government employees the right to organize collectively and to be represented by employee organizations (§ 3502), and obligates employers to bargain with employee representatives about matters that fall within the 'scope of representation' (§§ 3504.5, 3505).'"

18

"Under the MMBA, a public employer and a recognized employee organization have a mutual obligation to meet in person and confer promptly upon either party's request in an endeavor to reach [an] agreement on matters within the scope of representation before the public agency's adoption of its final budget for the coming year. [Citations.] The obligation to bargain in good faith requires that the parties 'must genuinely seek to reach agreement.' [Citation.] The MMBA does not require that the parties actually reach an agreement. [Citation.] '[A] public employer has the ultimate power to reject employee proposals on any particular issue.'

"Section 3504 defines the term 'scope of representation' to include 'all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order.' The California Supreme Court has stated: 'The definition of "scope of representation" and its exceptions are "arguably vague" and "overlapping." [Citations.] "'[W]ages, hours and working conditions,' which, broadly read could encompass practically any conceivable bargaining proposal; and 'merits, necessity or organization of any service' which, expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion."'" (*Association of Orange County Deputy Sheriffs v. County of Orange* (2013) 217 Cal.App.4th 29, 38-39 (*Orange County*).)

The California Supreme Court crafted a three-part test "to determine whether an employer's action is subject to the meet-and-confer requirements of section 3505: 'First, we ask whether the management action has "a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees." [Citation.] If not, there is no duty to meet and confer. [Citations.] Second, we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision. If not, then . . . the meet-and-confer requirement applies. [Citation.] Third, if both factors are present—if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees—we apply a balancing test. The action "is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question." [Citation.] In balancing the interests to determine whether parties must meet and confer over a certain matter [citation], a court may also consider whether the "transactional cost of the bargaining process outweighs its value."'" (*Orange County*, *supra*, 217 Cal.App.4th at p. 40.)

### 3.    *ADVERSE EFFECT*

We begin with the first step—whether the Department's 2010 revisions to the outside employment policy had a significant and adverse effect on the wages, hours, or working conditions of the Association's members. If it did not have a significant and

20

adverse effect, then there is no duty to meet and confer.  (*Orange County*, *supra*, 217 Cal.App.4th at p. 40.)

"The MMBA does not define the phrase 'other terms and conditions of employment.'  (§ 3504.)  Courts have construed the phrase 'wages, hours, and other terms and conditions of employment' to include the transfer of bargaining-unit work to nonunit employees, mandatory drug testing of employees, work shift changes, and the adoption of a disciplinary rule prohibiting use of public facilities for personal use." (*Orange County*, *supra*, 217 Cal.App.4th at pp. 40-41.)

The last category, regarding disciplinary rules prohibiting personal use of public facilities, refers to a case in which firefighters were prohibited from using city facilities to wash their personal vehicles while not on duty.  (*Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 806 (*Vernon*).)  The maximum penalty for violating the rule was demotion.  (*Id.* at p. 807.)

### a) Analogy to Overtime

The Association asserts the 2010 revisions to the policy have adversely affected its members because members' "outside employment opportunities are restricted."  The Association implies this restriction is similar to the removal of the opportunity to perform overtime work.

The loss of the opportunity to perform overtime work affects employees' workload and compensation and, therefore, that loss has been viewed as an adverse effect on "wages, hours and other terms and conditions of employment."  (*Dublin*

21

*Professional Fire Fighters, Local 1885 v. Valley Community Services Dist*. (1975) 45 Cal.App.3d 116, 119.)

In the instant case, the Association provides no explanation of how the 2010 policy revision has created greater restrictions on outside employment opportunities, when compared to the prior (2001) version of the outside employment policy, such that employees have been significantly and adversely affected by the revision in a manner that would be similar to a loss of overtime opportunities. The Association does not quote language from the revised policy or cite to the record in any way so as to demonstrate in what way its members may be significantly and adversely affected. Due to the lack of record citations and legal analysis, we deem this issue to be abandoned. (Cal. Rules of Court, rule 8.204(a)(1)(B), (C) [provide argument and record citations]; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1.)

On our own, we have reviewed the 2001 version of the outside employment policy and the 2010 revision to that policy. In the 2001 version of the policy, approval of outside employment could be denied or withdrawn if "[t]he outside employment requires the employee to work in excess of six (6) hours on a day on which they are scheduled to work eight (8) hours for the Sheriff's Department. Employees working twelve (12) hour shifts are not permitted outside employment on those days they are scheduled to work for the Sheriff's Department. A maximum of twenty-four (24) hours of outside employment per week is allowed."

In the 2010 version of the policy, the Department reserved the right to deny an outside employment application if "[t]he outside employment requires the employee to

22

work in excess of six (6) hours on a day on which they are scheduled to work eight (8) hours or four (4) hours on a day on which they are scheduled to work ten (10) hours for the Sheriff's Department. Employees working twelve (12) hour shifts are not permitted outside employment on those days they are scheduled to work for the Sheriff's Department. A maximum of twenty-four (24) hours of outside employment per week is allowed."

In the 2001 and 2010 versions of the statute, 24 hours per week of outside employment was permitted. Thus, there was no change in the total amount of hours an employee could work outside the Department. As a result, without (1) legal analysis as to (a) why the Association believes the policy revision significantly and adversely affected its members, and/or (b) how the policy amendments are analogous to a loss of overtime opportunities, and/or (2) record citations to provide some direction, we cannot decipher the Association's reasoning on this issue. Accordingly, as explained *ante*, we must regard the issue as having been abandoned. (*Grant-Burton v. Covenant Care, Inc*. (2002) 99 Cal.App.4th 1361, 1379 ["'[t]here is no duty on this court to search the record for evidence'"]; *Landry v. Berryessa Union School Dist*. (1995) 39 Cal.App.4th 691, 699-700 (*Landry*) ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned"]; *In re S.C.* (2006) 138 Cal.App.4th 396, 410 ["This is no legal analysis at all. It is simply a conclusion, unsupported by any explanation"].)

                b)     <u>Discipline</u>

23

The Association contends the 2010 policy revision had a significant and adverse effect on the wages, hours, or working conditions of the Association's members because the 2010 revision imposed new disciplinary rules in that "the Department can, for the first time, also take away an employee's opportunity to earn additional income through outside employment."

The Association does not quote language from the 2010 and 2001 versions of the policies, but does provide a record citation to the 2010 version of the policy. We infer the Association is referring to the following portion of the 2010 version of the policy: "Suspension or revocation of a previously approved outside employment permit may be included as a term or condition of sustained discipline . . . ." The 2001 version of the policy provided, "Outside employment without Departmental approval subjects the employee to Departmental discipline."

The 2010 discipline provision is fundamentally different than the discipline discussed in the 2001 version of the policy. The 2010 provision allows for approval of outside employment to be revoked in connection with any disciplinary matter. The 2001 version of the policy provided there may be an unidentified form of discipline for not following the outside employment policy.

As explained *ante*, the adoption of a disciplinary rule imposing a maximum penalty of demotion for personal use of public facilities has been held to constitute a condition of employment. (*Orange County*, *supra*, 217 Cal.App.4th at pp. 40-41; *Vernon*, *supra*, 107 Cal.App.3d at p. 817.) Accordingly, we will assume the disciplinary rule in the 2010 policy revision is a new condition of employment because

24

it is a disciplinary rule.  It must now be determined whether the Association's members have been affected in a significant and adverse manner by this new condition. (*Claremont*, *supra*, 39 Cal.4th at p. 631.)

The Association fails to explain (1) how there is an effect on its members, and (2) if there is an effect, how the effect is significant and adverse.  The Association implies that, per se, a change to a disciplinary rule causes a significant and adverse effect on employees.  Contrary to the Association's position, the determination of whether an agency's action is subject to the meet-and-confer requirements of section 3505 is largely a factual question.  (*Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 620-621.)

Accordingly, it is incumbent on the Association to explain how its members are affected, and why the effect is both significant and adverse.  In the Association's appellant's reply brief it cites to the 2008-2011 MOU.  The page cited by the Association concerns the procedure for arbitration hearings.  It then asserts discipline can include "'dismissal, demotion, reduction in compensation, [and] suspension.'"  The Association writes, "Also, under the new Policy, the Department can now take away, through disciplinary action, an employee's opportunity to earn additional income through outside employment."

There is no explanation provided with these facts.  It appears the Association is again arguing that the policy revision constitutes a working condition.  However, to the extent the Association is trying to show there would be a significant and adverse effect on its members, such a showing has not been made or explained.  For example, one

25

could reasonably look at the addition of the provision concerning loss of outside employment as a benefit to the employees. Instead of the harsher disciplinary actions of dismissal, demotion, suspension, and reduced pay at the employee's primary job, they can now have a lesser form of discipline—loss of a job where they can, at most, work 24 hours per week. The point being, without analysis, we cannot understand why or how the Association's members have been significantly and adversely affected by the 2010 policy revision.

Due to the lack of argument presented on the point, we deem the issue to be abandoned. (*Landry*, *supra*, 39 Cal.App.4th at pp. 699-700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned"].)

### c)     Miscellaneous

The Association asserts other aspects of the 2010 revisions concerning working conditions, such as (1) an employee on sick leave not being permitted to work at the employee's outside job, and (2) employees have to be rated at "satisfactory" or "meets standard" levels in order to obtain and retain outside employment.

Again, the Association takes a per se approach and fails to explain the issue. The Association writes in bold lettering, "'no discussion is required,'" and concludes these various items cause the 2010 revisions to be "a 'term or condition of employment.'" As the trial court aptly observed in its tentative ruling, the parties "have made this into an all or nothing position." The Association's per se approach to its argument has caused it not to analyze the issues as required by *Claremont*. (*Claremont*,

26

*supra*, 39 Cal.4th at p. 638 [setting forth the three-part test for determining a particular matter is subject to a duty to meet and confer].)

Contrary to the Association's position, a discussion of the facts is required. The Association needed to prove in the trial court, and explain in this court, why the 2010 revisions constitute terms and conditions of employment, and how the Association's members have been significantly and adversely affected by the change. Due to the lack of analysis and evidentiary support, we deem the issue to be abandoned. (*Landry*, *supra*, 39 Cal.App.4th at pp. 699-700 ["When an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned"].)

### d) Conclusion

As explained *ante*, there is only a duty to meet and confer if the agency's action has a significant and adverse effect on the wages, hours, or working conditions of the employees. (*Orange County*, *supra*, 217 Cal.App.4th at p. 40.) We cannot conclude, based upon the briefing, that the 2010 policy revision had a significant and adverse effect on the wages, hours, or working conditions of the Association's members. Accordingly, there was not a duty to meet and confer.

### 4. *IMPACT AND EFFECTS*

As explained *ante*, "[e]ven if an employer's action or policy has a significant and adverse effect on the bargaining unit's wages, hours, and working conditions, the employer may be excepted from bargaining requirements under the 'merits, necessity, or organization' language of section 3504." (*Claremont*, *supra*, 39 Cal.4th at p. 631.) This allows "'employers to make unconstrained decisions when fundamental

27

management or policy choices are involved.'" (*Id.* at p. 632.) However, while the employer/agency is not required to bargain over fundamental management decisions, it may be required to bargain over the effects of the decision. (*Id.* at p. 633.) For example, "'an employer has the right unilaterally to decide that a layoff is necessary, [but it] must bargain about such matters as the timing of the layoffs and the number and identity of employees affected.'" (*Id.* at p. 634.)

The Association contends that if this court determines the revisions to the policy were management decisions, then the Department should be required to bargain over the impact or effects of the revisions. We do not address the merits of this issue because the first step of the analysis has not been met—a showing that the revisions affected the Association's members in a significant and adverse manner. (*Claremont*, *supra*, 39 Cal.4th at p. 631.)

D.    SECTION 1126

The Association contends section 1126 (which concerns conflicts of interest activities by employees of local agencies) is based on section 19990 (which concerns conflicts of interest activities by state employees), and policies concerning section 19990 activities were determined, in an administrative law case, to be within the "scope of representation" and, thus, subject to collective bargaining. (*Professional Engineers in California Government v. State of California* (*Water Resources Control Board*) (1999) PERB Dec. No. 1337-S [1999 Cal. PERB Lexis 39].) Therefore, a policy concerning section 1126 activities must also fall within the "scope of representation"

28

and be subject to collective bargaining because the parallel laws should be interpreted in a compatible manner.

Statutory interpretation begins with an examination of the statute's plain language. If the plain language is clear—providing an obvious indication of the Legislature's intent—then our analysis stops at that point. If the plain language is not clear, for example, it is susceptible to more than one meaning, then we look to extrinsic aids to determine the Legislature's intent, such as legislative history, public policy, the purpose of the statute, contemporaneous administrative construction, and the overall statutory scheme of which the statute is a part. (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)

Section 1126, subdivision (c), provides: "The local agency shall adopt rules governing the application of this section. The rules shall include provision for notice to employees of the determination of prohibited activities, of disciplinary action to be taken against employees for engaging in prohibited activities, and for appeal by employees from such a determination and from its application to an employee. Nothing in this section is intended to abridge or otherwise restrict the rights of public employees under Chapter 9.5 (commencing with Section 3201) of Title 1." The plain language of subdivision (c) requires that the local agency adopt rules concerning conflicts of interest, but does not suggest a procedure for how the rules are to be adopted. It does not include or exclude the adoption of the rules from the collective bargaining process.

Section 1126, subdivision (d), provides: "The application of this section to determine what outside activities of employees are inconsistent with, incompatible

29

with, or in conflict with their duties as local agency officers or employees may not be used as part of the determination of compensation in a collective bargaining agreement with public employees." The plain language of subdivision (d) reflects conflicts of interest cannot be determined while simultaneously bargaining over compensation. The term "compensation" is not given a statutory definition within the laws pertaining to collective bargaining. (§ 3501.) Our Supreme Court has concluded, "The words 'salary' and 'compensation' are, in general usage, interchangeable and are synonymous in most definitions. 'Compensation' is '[t]he remuneration or wages given to an employee or, especially, to an officer. Salary, pay, or emolument." (*Treu v. Kirkwood* (1954) 42 Cal.2d 602, 609.)

Given the foregoing rules, the plain meaning of section 1126, subdivision (d), is that, during collective bargaining, determining what outside activities present a conflict of interest may not occur simultaneously with determining how much money employees are paid. For example, an agency could not offer to let employees work as private security guards (a conflict of interest) in exchange for lesser pay from the agency. In other words, if an activity has been determined to compromise a conflict of interest, then that conflict of interest is not open to negotiation in connection with compensation—conflicts of interest are not for sale.

Given this language in the statute, it appears the Legislature contemplated unions and agencies possibly bargaining over conflict of interest policies and wanted to limit the extent of those negotiations. A long held principle of statutory construction is *expressio unius est exclusio alterius*, which means "the expression of one thing in a

30

statute ordinarily implies the exclusion of other things." (*In re J.W.* (2002) 29 Cal.4th 200, 209.) In other words, if "a statute enumerates things upon which it is to operate it is to be construed as excluding from its effect all those [things] not expressly mentioned." (*Shelby v. Southern Pacific Co*. (1945) 68 Cal.App.2d 594, 599.)

The Legislature expressly limited collective bargaining from determining compensation while simultaneously determining what outside activities constitute a conflict of interest. (§ 1126, subd. (d).) By including this limitation, the Legislature necessarily left open the opportunity to collectively bargain over other issues related to outside employment. For example, unions and agencies could negotiate over issues such as the disciplinary action to be taken against employees who violate the conflict of interest rules. (See § 1126, subd. (c) [disciplinary rules].)

Based upon the plain language of section 1126, we conclude the Legislature anticipated that aspects of agencies' conflict of interest rules could possibly be part of the collective bargaining process. The statute does not state that conflict of interest rules necessarily fall within the scope of representation such that there is an affirmative or mandatory duty to bargain about conflict of interest policies. Rather, the plain language reflects that, if an agency's policy should fall within the scope of representation, such that collective bargaining occurs over the policy, then the determination of what constitutes a conflict of interest cannot be negotiated in connection with compensation.

The Association contends that outside employment policies adopted under section 1126 "are mandatory subjects of bargaining"—this appears to be a per se

argument. Contrary to the Association's position, there is nothing in the plain language of section 1126 mandating bargaining over any and all outside employment policies. For example, in the instant case, there is no showing that the policy has created a significant and adverse effect on employees, so collective bargaining is not required.

The only mention of bargaining in section 1126 is the exclusion of determining conflicts at the same time as determining pay. That exclusion in no way creates an affirmative duty to bargain in all situations. Given that there is no language in the statute indicating an intent to create an affirmative duty to bargain, we reject the Association's assertion that policies created under section 1126 per se fall within the scope of representation and, therefore, are always mandatory subjects of collective bargaining.

The Association supports its position regarding section 1126 and mandatory bargaining by arguing section 19990 is a parallel statute, and administrative law cases have interpreted policies created under section 19990 as falling within the scope of representation. The Association's argument is not persuasive because when interpreting a statute, one need only resort to construction with other statutes and interpretation by administrative law courts if the plain language of the statute is unclear. (*Hoechst Celanese Corp. v. Franchise Tax Bd.*, *supra*, 25 Cal.4th at p. 519.)

The Association fails to address the first step of the analysis—the plain language. As a result, we do not understand why the Association believes the plain language of the statute is unclear such that we must move on to the second step and look at section 19990 and administrative law cases. As explained *ante*, in our view, the

32

plain language of the statute is clear; therefore, there is no need to consider section 19990 and administrative law cases. The plain language being that there is not an affirmative or mandatory duty to bargain about conflict of interest policies, but should such bargaining occur, then the determination of what constitutes a conflict of interest cannot be negotiated in connection with compensation.

The Department contends section 1126, subdivision (d), exempts outside employment policies from the collective bargaining process. The Department contends that parsing out conflicts of interest in connection with compensation during the collective bargaining process would be absurd. (See *Upland Police Officers Assn. v. City of Upland* (2003) 111 Cal.App.4th 1294, 1304 [plain meaning of a statute does not need to be followed if doing so will lead to absurd results].) The Department asserts collective bargaining negotiations are complex, and it would be difficult to determine whether the parties' negotiations are touching on conflicts of interest related to compensation.

The Department explains: "For example, in exchange for shorter hours for [Association] members, the County might seek concessions on the rate of pay, uniforms and certain terms of the outside employment policy. In this scenario, negotiations would be diverted into consideration of whether such an exchange was even permissible."

The Department's argument fails because it is misunderstanding section 1126, subdivision (d). The Department appears to mistakenly believe compensation cannot be discussed at all in connection with outside employment activities, which we agree

would lead to complicated negotiations. However, the plain language of section 1126, subdivision (d), is not so broad. Section 1126, subdivision (d), indicates compensation shall not be determined when also determining what activities constitute a conflict of interest. For example, an agency may not offer to allow employees to serve as private security guards (a conflict of interest) in exchange for lesser pay from the agency, i.e., conflicts of interest are not for sale. There need only be a determination of what activities constitute conflicts of interest prior to determining compensation. Given the limited nature of the exclusion, we are confident that skilled negotiators will be able to perform their collective bargaining duties without much added difficulty.

E.      MOU

In the Association's appellant's reply brief, it asserts the zipper clause of the MOU does not permit the Department to make unilateral changes. We infer this is a response to the Department's argument, in its respondent's brief, reflecting the Association waived—in the MOU—its right to negotiate the policy revisions. To the extent our inference is incorrect, and the Association is trying to raise a new issue concerning the MOU in its appellant's reply brief, we cannot consider that issue. (*City of Corona v. Naulls* (2008) 166 Cal.App.4th 418, 425-426.)

### DISPOSITION

The judgment is affirmed. Respondents (County of Riverside, Stanley Sniff, the Board of Supervisors for the County of Riverside, and the Riverside County Sheriff's Department) are awarded their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

34

                                                    MILLER _____
                                                                              J.


We concur:

McKINSTER _____
                      Acting P. J.

SLOUGH _____
                              J.