Filed 6/23/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| COUNTY OF SONOMA,<br><br>        Petitioner,<br><br>v.<br><br>PUBLIC EMPLOYMENT<br>RELATIONS BOARD,<br><br>        Respondent;<br><br>SONOMA COUNTY DEPUTY<br>SHERIFFS' ASSOCIATION et al.,<br><br>        Real Parties in Interest. | A163100<br><br>(PERB Dec. No. 2772-M) |

The Meyers-Milias-Brown Act (MMBA; Gov. Code, §3500 et seq.; undesignated statutory references are to the Government Code) requires public agencies to meet and confer, i.e., bargain, in good faith with recognized employee organizations regarding changes to wages, hours, and other terms and conditions of employment — matters within the scope of the organizations' representation.  (§§ 3504, 3506.5, subd. (c).)  The Sonoma County Deputy Sheriffs' Association (DSA) and Sonoma County Law Enforcement Association (SCLEA; collectively, Associations) filed unfair practice complaints alleging the County of Sonoma (County) violated the MMBA when its board of supervisors (Board) placed Measure P on the November 2020 ballot.  The measure, which the voters ultimately approved, amends the Sonoma County Code (SCC) to enhance the investigative and

1

oversight authority of the County's Independent Office of Law Enforcement Review and Outreach (IOLERO) over the Sonoma County Sheriff-Coroner office (Sheriff). The Associations alleged the Board's decision to place Measure P on the ballot significantly and adversely affected their members' working conditions, such as discipline and investigation criteria and procedures; thus, the County was required to bargain prior to placement of the measure on the ballot.

The Public Employment Relations Board (PERB), which has jurisdiction over MMBA claims (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1287 (*Palo Alto*)), agreed. It concluded that, before placing the measure on the ballot, the County was required to bargain with the Associations regarding provisions relating to the investigation and discipline of employees. These included provisions granting IOLERO authority to: conduct independent investigations, recommend discipline of employees under investigation, subpoena records or testimony, personally observe Sheriff investigations, and review officer discipline records. (SCC §§ 2-392, subd. (d)(2), 2-394, subds. (b)(3), (b)(4), (b)(5)(ii), (vii)–(ix), (e)(2), and (f).) PERB declared these provisions void and unenforceable against any employees represented by the Associations. The County filed a petition for writ of extraordinary relief, and we granted writ of review. (§ 3509.5; Code Civ. Proc., § 1068, subd. (a).)

We conclude PERB failed to consider whether the decision to place certain Measure P provisions on the ballot significantly and adversely affected the working conditions of the Associations' members. (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 638 (*Claremont*).) Having omitted that analysis, PERB erred in determining the decision was a matter within the scope of representation under the MMBA

2

and thereby subject to collective bargaining. We further conclude PERB exceeded its authority by issuing a remedial order declaring voter-approved Measure P provisions void and unenforceable. Thus, we annul PERB's finding that the County violated its decisional bargaining obligations; we also annul PERB's remedial order declaring Measure P provisions void and unenforceable. (§ 3509.5, subd. (b); Code Civ. Proc., § 1075.) We remand for PERB to strike its remedy and to consider whether the decision to place the identified Measure P provisions on the ballot significantly and adversely affected the working conditions of the Associations' members. We affirm the remainder of PERB's decision.

## BACKGROUND

In 2016, the Board enacted an ordinance creating IOLERO to provide "objective, independent and appropriate review and audit of law enforcement administrative investigations, which include allegations of misconduct" by the Sheriff. Among other things, the ordinance authorized IOLERO to provide advice and recommendations regarding law enforcement policies and procedures, and to perform independent audits of internal departmental investigations regarding officer use of force incidents, incidents of misconduct, and corrective action taken. IOLERO was also empowered to receive and review citizen complaints and forward them to the Sheriff. (Former SCC, § 2-394, subd. (b)(1).) In addition, IOLERO could "[a]dvise if investigations appear incomplete or otherwise deficient and recommend further review as deemed necessary; when warranted, propose independent recommendations or determinations regarding investigations." (*Id*., subd. (b)(4).)

But the ordinance prohibited IOLERO from conducting "its own investigation of complaints against law enforcement personnel," compelling

3

"by subpoena the production of any documents or the attendance and testimony of any witnesses," or deciding "policies, direct[ing] activities, or impos[ing] discipline on other County departments, officers and employees." (Former SCC § 2-394, subds. (c)(1), (3) & (5).) IOLERO also could not "[d]isclose any confidential and/or privileged information to anyone not authorized to receive it." (*Id.*, subd. (c)(4).) Further, IOLERO and the Sheriff were required to create written protocols further defining and specifying the "scope and process providing for IOLERO's receipt, review and audit of complaints and investigations in a coordinated and cooperative manner." (*Id.*, subd. (d).) Accordingly, the Sheriff and IOLERO entered into an operational agreement establishing written protocols defining the scope and process of IOLERO's audit of law enforcement complaints and investigations.

## I.

In 2020, the Board acknowledged a need to amend IOLERO's policies and practices to enhance law enforcement transparency and accountability. In late July and early August, the Board reviewed proposed changes and considered several methods for amending the ordinance: directing staff to place an initiative on the ballot for voters to consider at the November 3, 2020 election, introducing a proposed initiative as an amendment to the existing IOLERO ordinance, or directly amending to the ordinance. The Board eventually approved for placement on the ballot the language in Measure P.

Measure P proposed numerous modifications to the IOLERO ordinance. It would enable IOLERO to independently investigate whistleblower complaints, deaths of individuals in the custody of the Sheriff or resulting from an officer's actions, or incomplete or otherwise deficient Sheriff investigations of complaints or incidents. IOLERO could "[d]irectly receive

4

all prior complaints for the involved deputy, previous investigation files (including *Brady*[1] investigations) and the record of discipline for each complaint" when reviewing, auditing, and analyzing completed Sheriff investigations. IOLERO could also directly access, review, and post on IOLERO's public website all body-worn camera videos where force was used, to the extent authorized by the law and with consideration of victim privacy and active investigations. In terms of collecting information, IOLERO could independently subpoena records or testimony and directly access all sources of investigative evidence. IOLERO's director was permitted to personally observe the Sheriff's investigatory interviews. In addition, IOLERO could make disciplinary recommendations, "as appropriate, for officers subject to IOLERO investigations."

Notably, Measure P did not propose to alter the ordinance's prohibition on IOLERO "decid[ing] policies, direct[ing] activities, or impos[ing] discipline on other county departments, officers and employees" or disclosing confidential information. Measure P also would not alter the requirement that IOLERO and the Sheriff create protocols to "further define and specify the scope and process providing for IOLERO's receipt, review, processing, and audit of complaints and investigations in a mutually coordinated and cooperative manner."

On August 6, 2020, the Board passed a resolution calling for a special election to submit Measure P to voters, to consolidate the special election with the general election on November 3, 2020, and to place the measure on

---

[1] A *Brady* list identifies "officers whom the agencies have identified as having potential exculpatory or impeachment information in their personnel files" which may need to be disclosed to the defense under *Brady v. Maryland* (1963) 373 U.S. 83. (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 36.)

that ballot. That same day, the president of SCLEA first learned about the scheduled vote on the measure, and DSA requested the County meet and confer regarding the measure's placement on the ballot. A few days later, SCLEA requested the County immediately cease and desist placing the measure on the ballot or implementing any changes to the IOLERO ordinance. The County did not bargain with the Associations before placing Measure P on the ballot. Instead, on August 11, the County expressed a willingness to bargain with the Associations on the negotiable effects of and legal objections concerning the measure.

Ultimately, the Sonoma County Registrar of Voters placed Measure P on the November 3, 2020 ballot, and it passed by a majority vote.

II.

The Associations, representing officers and other employees working for the Sheriff, filed unfair practice complaints against the County. The Associations alleged the County violated the MMBA by failing to first notify them about Measure P, and by failing to bargain over the decision to place the measure on the ballot or over the effects of its decision to place the measure on the ballot. On that basis, PERB issued complaints, notifying the County of its obligation to have an informal conference to settle with the Associations regarding their allegations or otherwise participate in a formal hearing.

Attempts to informally resolve the dispute failed. Following a hearing, PERB submitted the matter directly to itself for a decision. (Cal. Code Regs., tit. 8, § 32215.) PERB concluded, "Measure P's amendments related to investigation and discipline of employees" are "subject to decision bargaining" — i.e., the County's decision to place certain Measure P provisions on the ballot triggered an obligation to bargain. Those provisions grant IOLERO

6

authority to: conduct independent investigations of Sheriff's employees; recommend discipline of employees; subpoena records or testimony in investigations; review an officer's discipline record, including all prior complaints; and allow its director "to personally sit in and observe" investigative interviews. (SCC, §§ 2-392, subd. (d)(2), 2-394, subds. (b)(3), (b)(4)), (b)(5)(ii), (vii)–(ix), (e)(2) & (f).) PERB explained these provisions created a parallel investigative scheme for officers, and IOLERO's procedures "may deviate from the investigations conducted by the Sheriff's Office." PERB found the County failed to provide the Associations with notice or an opportunity to bargain over its decision.

PERB further concluded that, even if the County was not required to bargain over its *decision* to place other Measure P provisions on the ballot, the County was nonetheless required to bargain regarding the *effects* of that decision. Those provisions include: posting body-worn camera video on IOLERO's public website, and directly contacting complainants, witnesses, and the supervisor of an employee subject to investigations being conducted by IOLERO or being audited by IOLERO. (SCC, § 2-394, subds. (b)(5)(iii), (iv), (g)(3).) PERB found the County failed to bargain over the foreseeable effects of its decision concerning those provisions before the County implemented it by placing Measure P on the November 2020 ballot. Consequently, the County violated its obligation to bargain under the MMBA.

PERB severed the amendments from Measure P and declared them void and unenforceable as to any employees represented by the Associations. It ordered the County to cease and desist from enforcing or applying those amendments to employees represented by the Associations, to make employees whole for any losses resulting from application of those

7

amendments, and to meet and confer with the Associations "before placing any matter on the ballot that affects employee discipline and/or other negotiable subjects."

## DISCUSSION

The County argues PERB failed to determine whether the Board's decision to place Measure P on the ballot significantly and adversely affected the Associations' members' working conditions, and thus was a matter within the scope of representation under the MMBA. That failure, the County contends, resulted in PERB erroneously concluding it was required to engage in "decision" bargaining before deciding to place the measure on the ballot. The County also challenges PERB's determination that it had a duty to provide notice of the measure and to bargain over the effects of the measure even in advance of the measure's implementation. Finally, the County contends PERB's remedial order exceeded the agency's statutory and jurisdictional authority.

### I.

We begin by setting forth the relevant law. PERB has jurisdiction over MMBA claims, including resolving disputes about whether a matter is within the scope of representation. (*Palo Alto*, *supra*, 5 Cal.App.5th at p. 1287.) Because PERB's construction of the MMBA is within its field of expertise, courts follow PERB's interpretation unless it is clearly erroneous. (*Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 911–912 (*Boling*).) But courts retain final authority to interpret the statute. (*Id.* at p. 912.) PERB's findings of fact are conclusive "if supported by substantial evidence on the record considered as a whole." (§ 3509.5, subd. (b).) The court may not reweigh the evidence. (*Boling*, at p. 912.) Rather, "the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable."

8

(*Id*. at p. 913.)  PERB's remedial orders are reviewed for an abuse of discretion.  (*Boling v. Public Employment Relations Bd*. (2019) 33 Cal.App.5th 376, 387 (*Boling II*).)

The purpose of the MMBA is to promote full communication between public employers and their employees, as well as to improve personnel management and employer-employee relations in public agencies.  (§ 3500; *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 597.)  The MMBA requires the governing body of a local public agency to meet and confer, i.e., bargain, in good faith with representatives of recognized employee organizations regarding matters within the scope of representation.  (*Boling, supra*, 5 Cal.5th at p. 914 [" 'duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations' "].)  Such matters include, but are not limited to, wages, hours, and other terms and conditions of employment.  (§§ 3504, 3505; *Boling*, at p. 913.)  Fundamental managerial decisions on " 'the *merits, necessity, or organization* of any service or activity provided by law or executive order,' " by contrast, are outside the scope of representation and not subject to the bargaining requirement.  (*Claremont, supra*, 39 Cal.4th at p. 631 [employer has the unconstrained right to make fundamental management or policy choices]; § 3504.)  When bargaining is required, agencies may not make unilateral changes in employee wages and working conditions until the parties have come to an impasse.  (*Boling*, at p. 914.)  Parties, however, "are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue.' "  (*Claremont*, at p. 630.)

"The definition of 'scope of representation' and its exceptions are 'arguably vague' and 'overlapping.' "  (*Claremont, supra*, 39 Cal.4th at p. 631.)

An expansive interpretation of " ' "merits, necessity or organization of any service" ' " could " 'swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion.' " (*Ibid.*) In *Claremont*, our high court addressed "whether an employer's action implementing a fundamental decision" was subject to the bargaining requirement by formulating a three-part test. (*Id.* at pp. 628, 632–633, 638.)

First, if the management action *does not* have a significant and adverse effect on wages, hours, or working conditions of the bargaining-unit employees, there is no duty to meet and confer. (*Claremont*, *supra*, 39 Cal.4th at p. 638.) Second, if there is a significant and adverse effect, "we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision." (*Ibid.*) If it does not, "the meet-and-confer requirement applies." (*Ibid.*) "Third, if both factors are present—if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees—we apply a balancing test." (*Ibid.*) Under that balancing test, an action " 'is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question.' " (*Ibid.*) When balancing these interests, the court may consider whether the " 'transactional cost of the bargaining process outweighs its value.' " (*Id.* at pp. 638–639.) In sum, a public employer's "duty to bargain arises under two circumstances: (1) when the decision itself is subject to bargaining, and (2) when the effects of the decision are subject to bargaining, even if the decision, itself, is nonnegotiable." (*El Dorado County Deputy Sheriff's Assn. v. County of El Dorado* (2016) 244 Cal.App.4th 950, 956.)

10

Several years later, the Supreme Court in *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259 (*International Fire Fighters*) addressed whether a decision to lay off firefighters for economic reasons was a matter within the scope of representation. (*Id.* at pp. 264–265.) The court identified three categories of management decisions with different implications for the scope of representation. (*Id.* at pp. 272–273, citing *First National Maintenance Corp. v. NLRB* (1981) 452 U.S. 666, 676–680 (*First National*).) The first category contains decisions that have an " 'indirect and attenuated impact on the employment relationship,' " such as advertising, product type, and financing arrangements, that are not subject to mandatory bargaining. (*International Fire Fighters*, at p. 272.) The second category contains "decisions directly defining the employment relationship, such as wages, workplace rules, and the order of succession of layoffs and recalls," which *are* subject to mandatory bargaining. (*Ibid.*) The third category contains management decisions "that directly affect employment, such as eliminating jobs," that may be subject to mandatory bargaining because the decision changes " 'the scope and direction of the enterprise.' " (*Id.* at p. 273.) Bargaining is thus required for this third category of decisions " 'that have a substantial impact on the continued availability of employment' " if " 'the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.' " (*Ibid.*)

Given the facts of the case, *International Fire Fighters* had no need to discuss or apply the first prong of the *Claremont* test. (*International Fire Fighters*, *supra*, 51 Cal.4th at pp. 272–273.) Instead, the court concluded that when a public employer is faced with declining revenues or financial adversity, the *decision* to unilaterally lay off employees is not subject to

11

mandatory bargaining. (*Id*. at pp. 276–277.) The employer must, however, provide employees with the opportunity to bargain over the implementation, i.e., *effects*, of that decision, such as the number of employees to layoff, timing of layoffs, and the impact of the layoffs on the workload of the remaining employees. (*Ibid*.) *International Fire Fighters* reaffirmed the rule that "under the MMBA a local public entity may unilaterally decide that financial necessity requires some employee layoffs, although the entity must bargain over the implementation of that decision and its effects on the remaining employees." (*Id*. at pp. 276–277.)

With the foregoing in mind, we address the County's arguments in turn.

## II.

The County argues PERB erroneously failed to address the first prong of the *Claremont* test when considering whether the decision to place certain Measure P provisions on the ballot was within the Associations' scope of representation and thus subject to the MMBA's mandatory bargaining requirement. We agree.

In its decision, PERB rejected the County's argument that "Measure P as a whole falls under section 3504's fundamental management right exclusion because it involves relations between law enforcement and the community." In doing so, PERB relied on *International Fire Fighters* in determining whether the Board's decision to place on the ballot a measure enhancing civilian oversight of law enforcement is within the scope of representation. PERB stated the Measure P provisions at issue — granting IOLERO authority to conduct independent investigations of Sheriff employees and recommend discipline of those employees; allowing IOLERO to subpoena records or testimony in investigations; allowing IOLERO to

12

review an officer's discipline record, including all prior complaints; and allowing the IOLERO director "to personally sit in and observe" investigative interviews[2] — directly affect the *disciplinary procedures and standards* of the Sheriff. Because "discipline is a traditionally bargainable area," PERB applied "the balancing test for changes in the third category" of the *International Fire Fighters* test.

Applying this balancing test, PERB recognized the "County has a substantial interest in increasing transparency and fostering community trust in policing and correctional services." But, according to PERB, the benefits of collective bargaining regarding the Measure P provisions aimed at investigating and disciplining employees outweighed the County's interest. PERB concluded, "these Measure P amendments establish a parallel investigative scheme for County peace officers." Thus, the Associations have the right to bargain before the County imposes this parallel investigatory process, particularly since IOLERO's procedures "*may* deviate from the investigations conducted by the Sheriff's Office." (Italics added.)

At the outset, the parties appear to agree the County's decision to place Measure P on the ballot is a fundamental managerial or policy decision. We likewise agree. The County wanted to strengthen the existing IOLERO ordinance "to increase transparency and accountability of law enforcement and build the public's trust in County government and the Sheriff's Office." Sheriff operations and its employees' conduct are a legitimate concern for a board of supervisors, and measures regarding investigations of law enforcement conducted by a group unaligned with the Sheriff may restore public confidence in law enforcement. (*Dibb v. County of San Diego* (1994)

---

[2] The relevant SCC provisions are section 2-392, subdivision (d)(2), and section 2-394, subdivisions (b)(3), (b)(4), (b)(5)(ii), (vii)–(ix), (e)(2), and (f).

8 Cal.4th 1200, 1209.)  Moreover, decisions "involving the betterment of police-community relations . . . directly affect the quality and nature of public services" and have been deemed fundamentally managerial.  (*Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 664; *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 937 (*Berkeley Police Assn.*).)

We also agree with the County that, "[t]o the extent the [Board's] fundamental policy decisions implicate conditions of employment," a further examination is necessary to determine whether decision bargaining regarding Measure P was required.  PERB concedes it did not ascertain whether the decision to place Measure P on the ballot had a "significant and adverse effect" on the wages, hours, or working conditions of the bargaining-unit employees — the first prong of the *Claremont* test.  (*Claremont*, *supra*, 39 Cal.4th at pp. 638–639.)  Its failure to do so was clear error.  Given the circumstances here, its reliance on *International Fire Fighters* was not appropriate.

In *International Fire Fighters*, there was no dispute the layoff decision was managerial and directly affected employment.  (*International Fire Fighters*, *supra*, 51 Cal.4th at p. 274.)  The court then proceeded directly to balance the interests since "the scope of a public employer's duty to bargain in regard to a *layoff decision* is generally determined by application of a balancing test."  (*Ibid.*, italics added.)  And case law establishes employers must bargain with employees when implementing a layoff decision motivated by reducing labor costs.  (*Id.* at p. 273, citing *First National, supra*, 452 U.S. at pp. 682–686; *NLRB v. 1199, Nat'l Union of Hospital & Health Care Employees* (4th Cir. 1987) 824 F.2d 318, 321–322; *Pan American Grain Co. v. NLRB* (1st Cir. 2009) 558 F.3d 22, 27.)  Determining whether the decision to

14

lay off the firefighters for budgetary purposes had a significant, adverse effect on working conditions was thus unnecessary. (*Claremont*, *supra*, 39 Cal.4th at p. 638.)

Here, in contrast, application of the full *Claremont* test was required to resolve whether the decision to place Measure P on the ballot — a measure expanding civilian investigative authority and oversight of the Sheriff, not layoffs — was within the scope of representation. PERB itself acknowledged that applying *International Fire Fighters* in these circumstances was novel. Indeed, even after *International Fire Fighters* was decided, courts continue to assess whether a matter significantly and adversely affects working conditions and thus is within the scope of representation in nonlayoff cases. (See e.g., *Association of Orange County Deputy Sheriffs v. County of Orange* (2013) 217 Cal.App.4th 29, 40–41 [assessing whether sheriff's order delaying officer access to internal affairs investigative files was within the scope of representation]; *Santa Clara County Correctional Peace Officers' Assn., Inc. v. County of Santa Clara* (2014) 224 Cal.App.4th 1016, 1029–1030 [examining decision reducing work schedules for officers].) There is no indication *International Fire Fighters* conflicts with *Claremont* — let alone that the former overruled or supplanted the latter — nor does PERB so contend. That *International Fire Fighters* is the most recent Supreme Court case to address whether a matter is subject to mandatory bargaining is, contrary to PERB's assertions, no reason to ignore the factors set forth in *Claremont*.

PERB insists the Measure P provisions granting IOLERO authority to conduct independent investigations, recommend discipline of employees under investigation, subpoena records or testimony, personally observe Sheriff investigations, and review officer discipline records changed the rules governing discipline. Because employee discipline is historically within the

15

scope of representation, PERB argues it properly applied *International Fire Fighters*. But the cases cited by PERB — addressing employers changing the criteria and procedures for actually imposing discipline — are distinguishable from the circumstances here.

In *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, the city implemented a rule prohibiting firefighters from washing personal vehicles with city facilities, with violations resulting in demotion. (*Id.* at pp. 808, 815, 816–817, fn. 14.) In *Murphy Diesel Co.* (1970) 184 NLRB 757, the employer revised work rules generally requiring consistent employee work attendance and punctuality, and it imposed new rules expressly authorizing discipline if there were two instances of unexcused tardiness or absenteeism within a three-month period. (*Id.* at pp. 758–759.) Similarly, in *Rahco, Inc.* (1982) 265 NLRB 235, the employer changed a "lax system of discipline" which did not include any guidelines or progressive discipline standards for acts of misconduct. (*Id.* at p. 241.) The new policy, in contrast, resulted in employees being terminated upon receipt of more than two reprimands regarding the same infraction issued within a thirty-day period. (*Id.* at p. 242.) In *Pacific Maritime Assn. v. NLRB* (D.C. Cir. 2020) 967 F.3d 878, employers committed unfair labor practices by applying disciplinary provisions of one collective bargaining agreement to another bargaining unit, resulting in penalties beyond those originally agreed to. (*Id.* at p. 881; *Medicenter, Mid-South Hosp.* (1975) 221 NLRB 670, 675 [requiring employees to submit to polygraph examination was a change in condition of employment because it changed the mode of an investigation and character of proof "on which an employee's continued job security might hinge"]; *Johnson-Bateman*

16

*Co.* (1989) 295 NLRB 180 [imposing a drug and alcohol testing requirement].)[3]

Here, Measure P authorized IOLERO to investigate potential misconduct and to *recommend* discipline rather than changing substantive rules or procedures for actually imposing discipline. Measure P states that IOLERO's new powers and duties would include the power to "[m]ake discipline *recommendations*, as appropriate, for officers subject to IOLERO investigations." (Italics added.) Notably, Measure P did not alter the existing prohibition on IOLERO "[d]ecid[ing] policies, direct[ing] activities, or *impos*[*ing*] discipline on other County departments, officers and employees." (Italics added.) Nothing in the ordinance requires IOLERO to recommend imposing discipline, nor is there anything requiring the Sheriff to accept IOLERO's discipline recommendations.

True, PERB found Measure P's conferring IOLERO with expanded access to materials — *Brady* materials and exonerated or unfounded complaints — when reviewing, auditing, and analyzing administrative and public complaints "could expand the evidence the County uses as a basis for discipline." Leaving aside IOLERO's role under Measure P of recommending

---

[3] Relying on *San Bernardino Community College District* (2018) PERB Decision No. 2599 [43 PERC ¶ 85], PERB argues "the duty to bargain applies to changes involving 'the type of evidence an employer may use to evaluate performance or take disciplinary action.' " In that case, the community college district unilaterally implemented a policy of using global positioning system tracking device data to assess employee misconduct, and PERB concluded this policy was a matter within the scope of representation under the Educational Employment Relations Act. (§ 3540 et seq.; *San Bernardino*, at pp. 1, 10.) But the Educational Employment Relations Act expressly states that evaluation procedures constitute terms and conditions of employment within the scope of negotiations. (§ 3543.2.) There is no analogous statutory provision in the MMBA. PERB's reliance on this case is misplaced.

17

rather than imposing discipline, there were no changes to the Sheriff's personnel complaints policy, which precludes the Sheriff from using investigations resulting in findings other than sustained to adversely affect a member's career.  In addition, the Sheriff's existing personnel complaint investigation procedures and policies note that "an investigation may be based on the underlying acts or omissions for which the deputy has been placed on a *Brady* list or may otherwise be subject to disclosure pursuant to *Brady v. Maryland*."  While Measure P altered IOLERO's access to these materials, the Sheriff could always use *Brady* materials as part of its investigations.  (*Berkeley Police Assn.*, *supra*, 76 Cal.App.3d at p. 938 [no change in working conditions where employees "were working under these rules and conditions even prior to the challenged practices"].)  To the extent PERB argues alterations to the investigative process are traditionally subject to bargaining, we disagree this is necessarily so.  Changes to investigatory procedures in the disciplinary process are not always within the scope of representation and thus subject to mandatory bargaining.  (See, e.g., *Association of Orange County Deputy Sheriffs v. County of Orange*, *supra*, 217 Cal.App.4th at p. 45.)

Rather than changing the criteria for imposing discipline, Measure P expressly states it provides "[m]eaningful independent oversight and monitoring of sheriffs' departments."  In this respect, the circumstances here appear more akin to *Berkeley Police Assn.*, which as PERB acknowledges, also dealt with a police review commission.  (*Berkeley Police Assn.*, *supra*, 76 Cal.App.3d at p. 937 [unilaterally allowing a member of a citizens' police review commission to attend police department hearings regarding citizen complaints was a management decision outside the scope of representation].)  We cannot say the Measure P provisions "invariably raises disciplinary

18

issues" for which mandatory decision bargaining is required. (*Claremont*, *supra*, 39 Cal.4th at p. 634.) Application of the first prong of the *Claremont* test here was necessary to determine whether the decision to place Measure P on the ballot was within the scope of representation.

Alternately, PERB argues its failure to rely on *Claremont* was harmless because the balancing test in *International Fire Fighters* is "largely the same [as *Claremont's*] when a decision involves both a fundamental managerial decision and has a direct effect on employment conditions." (*International Fire Fighters*, *supra*, 51 Cal.4th at pp. 272–273 [applying balancing test from *First National*, *supra*, 452 U.S. at pp. 676–680]; *Claremont*, *supra*, 39 Cal.4th at p. 637 [same].) PERB suggests relying on either *International Fire Fighters* or *Claremont* would lead to the same result. But this argument ignores the importance of *Claremont*'s first prong — attempting to conflate a *significant and adverse* effect and a *direct* effect. Practically " 'every managerial decision has some impact on wages, hours, or other conditions of employment.' " (*Claremont*, at p. 635.) "For an action by an employer to fall within the scope of representation, and thus be subject to the mandatory bargaining requirements of the MMBA, it must have a *significant* effect on the 'wages, hours, and other terms and conditions of employment.' " (*Building Material & Construction Teamsters' Union v. Farrell*, *supra*, 41 Cal.3d at p. 659.) If the managerial decision does not have a " 'significant and adverse effect on . . . bargaining-unit employees,' " there is no need to balance the interests and there is no duty to meet and confer. (*Claremont*, at pp. 638–639 ["Because there was no significant and adverse effect, we need not balance the City's need for unencumbered decisionmaking."].)

In sum, PERB's reliance on *International Fire Fighters* — skipping an assessment of the first prong of *Claremont* — when deciding whether the

County's decision to place Measure P on the ballot was within the scope of representation was clearly erroneous. The additional cases upon which PERB relies do not compel a different result. In light of this conclusion, we do not address PERB's argument that the County failed to give the Associations notice and opportunity to meet and confer before making its managerial decision to place Measure P provisions on the ballot. (SCC §§ 2-392, subd. (d)(2), 2-394, subds. (b)(3), (b)(4), (b)(5)(ii), (vii)–(ix), (e)(2), (f).)

### III.

The County contends PERB erroneously concluded it violated its duty to provide notice and an opportunity to bargain over the effects of the Board's decision to place certain Measure P provisions — IOLERO's posting body-worn camera video on its website and IOLERO contacting witnesses, complainants, and supervisors of employees during investigations — on the ballot *before* that decision was implemented, i.e., before the measure was placed on the ballot. We disagree.

Under the MMBA, there is a duty to bargain regarding the "effects of a decision that has a foreseeable effect on matters within the scope of representation, even where the decision itself is not negotiable" — effects bargaining. (*County of Santa Clara* (2019) PERB Dec. No. 2680-M [44 PERC ¶ 86, pp. 11–12].) (Effects bargaining is distinct from whether a decision must be bargained, i.e., decision bargaining.) An employer must give an exclusive representative reasonable notice and an opportunity to bargain over any reasonably foreseeable effects of a nonnegotiable management decision *before* it implements the decision. (*County of Santa Clara* (2013) PERB Dec. No. 2321-M [38 PERC ¶ 30, p. 30].) An "employer's duty to provide notice and an opportunity to negotiate the effects of its decision . . . arises when the employer reaches a firm decision" but before it

20

implements that decision.  (*Mt. Diablo Unified School District* (1983) PERB Dec. No. 373 [8 PERC ¶ 15017, p. 26].)

But an employer may implement a nonnegotiable management decision prior to completing effects bargaining where: (1) the implementation date is based on an immutable deadline "or an important managerial interest, such that a delay in implementation beyond the date chosen would effectively undermine the employer's right to make the nonnegotiable decision;" (2) the employer provides sufficient notice of the decision and advance notice of the implementation date "to allow for meaningful negotiations prior to implementation;" and (3) "the employer negotiates in good faith prior to implementation and continues to negotiate in good faith after implementation as to those subjects not necessarily resolved by virtue of the implementation."  (*Compton Community College District* (1989) PERB Dec. No. 720 [13 PERC 20057, pp. 14–15] (*Compton*).)

As relevant here, the Board decided on August 6, 2020 to place Measure P on the ballot.  The same day, the Board called a special election for November 3, 2020 on Measure P, thus placing the measure on the ballot. On August 11, 2020, the County sent the Associations written offers to collaboratively address the negotiable effects of Measure P provisions before they were implemented.  Given this record, PERB correctly concluded the County was obliged to engage in effects bargaining with the Associations before implementing its decision to place Measure P on the ballot.

There is no dispute Measure P's provisions allowing IOLERO to directly access, review, and publicly post on IOLERO's website body-worn camera video where force was used, and allowing IOLERO to contact the witnesses, complainants, and supervisor of an employee subject to an IOLERO investigation or audit had foreseeable effects that were subject to

21

the MMBA's effects bargaining requirement. (SCC § 2-394, subds. (b)(5)(iii)–(iv), (g)(3).) PERB found there was nothing in Measure P obligating IOLERO to follow various Sheriff protocols requiring, among other things, the impacted individual be given notice and opportunity to review the video or perform a threat assessment before the video is released — all items that could impact workplace safety. (SCC § 2-394, subd. (b)(5)(iii).) PERB similarly found Measure P does not specify whether those individuals contacted by IOLERO included Association-represented employees who may be accused of wrongdoing, or whether Association-represented witnesses would be paid. (SCC § 2-394, subds. (b)(5)(iv), (g)(3).)

PERB concluded the County was obligated to bargain with the Associations before it implemented its decision, i.e., before it actually placed the Measure P provisions on the November 2020 ballot. The County disputes the timing of its duty to provide notice and opportunity to bargain over these effects. According to the County, notice and bargaining must occur before applying the identified and voter-approved Measure P provisions to the Associations' members, but not prior to placing the measure on the ballot. Because it has not yet applied the provisions to the Associations' members, the County insists it has not violated its duty to bargain. We disagree.

The relevant decision at issue was the Board's placement of Measure P on the November 2020 ballot, not the voters' subsequent decision to approve Measure P. On August 6, 2020, the Board approved the language of Measure P. The same day, the Board approved calling a special election to submit Measure P to the voters at the November 3, 2020 election. On these facts, there was a firm decision to place Measure P on the ballot *and* that decision was implemented, i.e., Measure P was placed on the ballot, on the same day — August 6, 2020.

22

PERB did not improperly conflate the firm decision date and implementation date, contrary to the County's assertions. When determining a public agency's MMBA obligation to bargain the effects of ballot measures, courts have focused on the decisions or actions regarding placement of the measure on a ballot rather than the measure's subsequent enactment. (E.g., *International Assn. of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687, 692 & fn. 7, 693 [rejecting attempt "to separate the *resolution* proposing the amendments being placed on the ballot from the *enactment* of the amendments themselves" since the resolution was part of the procedural irregularity in enacting the amendment]; cf. *Boling*, *supra*, 5 Cal.5th at pp. 904, 908–909, 919 [mayor's pursuit of a citizen initiative for pension reform was a managerial decision subject to the MMBA's bargaining requirement, even though citizen group drafted the initiative amending the city charter, city council voted to place the initiative on the ballot, and voters subsequently approved the initiative]; *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach*, *supra*, 36 Cal.3d at pp. 594, 602 ["city council was required to meet and confer with the relators before it proposed charter amendments which affect matters within their scope of representation" even though voters ultimately adopted the charter amendments].)

Nor did PERB erroneously conclude the County failed to provide notice and an opportunity to engage in effects bargaining before implementing its decision by placing certain Measure P provisions on the November 2020 ballot. On August 11, 2020 — five days after the Board placed Measure P on the ballot — the County sent the Associations written offers to collaboratively address the negotiable effects of the Measure P provisions before they were implemented. But August 7 was the last day to place an initiative on the November 3 special election ballot and the last day to withdraw the initiative.

23

(Elec. Code, §§ 1405, subd. (b), 9118.5.) Given these timelines, by August 11, the Associations were precluded from proposing alternatives to the provisions that could diminish the foreseeable effects on the conditions of employment resulting from the County's decision to place the measure on the ballot. (*City of Sacramento* (2013) PERB Dec. No. 2351-M [38 PERC ¶ 104, p. 22].) To the extent the County argues it is still able to fulfill its effects bargaining obligation by expressing its willingness to bargain amendments to IOLERO's operational agreement with the Sheriff, the County fails to focus on the relevant decision that was implemented — the Board's decision to place Measure P on the ballot, not voter's subsequent approval of the measure.

We also reject the County's argument that PERB improperly applied the test set forth in *Compton* to determine whether the County could implement its decision without exhausting its effects bargaining obligation. PERB found that although August 7 was the last day to submit an initiative for the November 2020 ballot, a statutory deadline for submitting ballot measures does not constitute an immutable deadline under *Compton*. (*County of Santa Clara* (2010) PERB Dec. No. 2114-M [34 PERC ¶ 97, p. 15; county could not place measure on the ballot before completing bargaining because there was no imminent need for county to act prior to statutory deadline for submitting the measure for the ballot].) PERB found nothing in the record indicating that implementing the decision at a later date — for example placing Measure P on a ballot for a later election, such as March 2021 — would have undermined the Board's decision to present the voters with changes to the IOLERO ordinance. And as previously discussed, PERB determined the County failed to give the Associations notice and an opportunity to bargain over Measure P's effects before placing the measure

24

on the ballot. (*Ante*, at pp. 23–24.) *Compton* does not excuse the County's failure to bargain with the Associations here.

Rather than challenging these findings, the County argues the *Compton* test is inapplicable by rehashing its argument that Measure P has not yet been implemented. We have already rejected that argument above. In sum, PERB's conclusion that the County violated its duty to bargain regarding the effects of Measure P was not clearly erroneous, it was correct.

## IV.

The County contends PERB exceeded its authority when it declared void and unenforceable the provisions of Measure P that were subject to effects bargaining — SCC sections authorizing IOLERO to publicly post on IOLERO's website body-worn camera video where force was used and allowing IOLERO to contact the witnesses, complainants, and supervisor of an employee subject to an IOLERO investigation or audit — as to the employees represented by the Associations. (SCC § 2-394, subds. (b)(5)(iii), (iv), (g)(3).) We agree.[4] (§ 3509, subd. (b); *Boling II*, *supra*, 33 Cal.App.5th at p. 387 [remedial order standard of review]; *Jasmine Vineyards, Inc. v. Agricultural Labor Relations Bd.* (1980) 113 Cal.App.3d 968, 982 ["It is only when the remedies ordered by the Board are patently outside the Board's authority that a reviewing court can interfere."].)

The traditional remedy for unlawful unilateral changes is to restore the prior status quo by requiring the employer to rescind the change and compensate the employees for losses suffered because of that change. (*Boling*

---

[4] Our decision that PERB failed to properly assess whether other Measure P provisions were within the scope of representation — SCC sections 2-392, subdivision (d)(2); 2-394, subdivisions (b)(3), (b)(4), (b)(5)(ii), (vii)–(ix), (e)(2), and (f) — makes it unnecessary to address the propriety of PERB's order declaring those amendments void and unenforceable.

25

*II*, *supra*, 33 Cal.App.5th at p. 388.) Yet in doing so, PERB cannot interfere with purely legislative action by commanding or prohibiting legislative acts because it would violate the "separation of powers among the three coequal branches of the government." (*Palo Alto*, *supra*, 5 Cal.App.5th at pp. 1310–1311.) It is, however, within PERB's power to declare void a resolution passed in violation of the MMBA. (*Palo Alto*, at p. 1320.) Such a declaration "effectively returns the parties to the status quo ante." (*Id*. at p. 1317.)

In arguing it had the authority to declare the voter-approved Measure P *provisions* wholly or partially void and/or unenforceable, PERB relied on *Palo Alto*. This misreads the decision. In *Palo Alto*, a union alleged the Palo Alto City Council failed to consult it before passing a resolution placing an initiative on the ballot to repeal binding interest arbitration. (*Palo Alto*, *supra*, 5 Cal.App.5th at pp. 1284–1285.) After concluding the actions violated the MMBA, PERB directed the city council to rescind its resolution placing the measure on the ballot — voters had passed the ballot initiative while the unfair practice charge was pending, and PERB concluded a quo warranto action was the exclusive remedy to overturn the election results. (*Palo Alto*, at pp. 1285–1287.) On writ review, the Court of Appeal concluded PERB lacked the authority to order rescission of the resolution. (*Id*. at p. 1316 ["ordering rescission of a legislative act is in itself a legislative act" that violates the separation of powers].) Instead, PERB possessed "the requisite authority to invalidate a *resolution* that violates the MMBA." (*Id*. at p. 1310, italics added.) *Palo Alto* did not indicate that authority extended to "voiding the unlawfully adopted Measure P *amendments*," as PERB contends. (Italics added.)

*Boling II* similarly does not assist PERB, contrary to PERB's assertion otherwise. (*Boling II*, *supra*, 33 Cal.App.5th at p. 388 ["any action by PERB

effectively invalidating the Initiative or assuming the Initiative is or will be invalidated impermissibly encroaches on constitutional law, statutory law, and policy matters involving initiatives, elections, and the doctrine of preemption that are unrelated to the [MMBA]"].)  In that case, the Supreme Court had previously concluded the City of San Diego violated the MMBA when the mayor advanced a pension reform initiative proposing to amend the city's charter without meeting and conferring with the affected employee union. (*Boling II*, at p. 381.)  It remanded the matter to the Court of Appeal to address the judicial remedy for that violation.  (*Ibid*.)  On remand, the Court of Appeal rejected the unions' request to invalidate the voter-approved initiative because its validity was more appropriately addressed in a separate quo warranto proceeding.[5]  (*Boling II*, at p. 381; Code Civ. Proc., § 803 et seq.)  The court noted the remedy of quo warranto was "available to challenge 'purported irregularities in the legislative process of a charter amendment which has taken effect.' "  (*Boling II*, at p. 384.)  Because equitable remedies such as declaratory relief are generally unavailable where there is an adequate legal remedy like quo warranto, the union could only challenge the initiative's procedural irregularities in the quo warranto proceeding.  (*Ibid*.)

---

[5] Quo warranto may be brought by the Attorney General " 'upon his own information, or upon a complaint of a private party' " against any person "who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise, or against any corporation, either de jure or de facto, which usurps, intrudes into, or unlawfully holds or exercises any franchise, within this state." (*Nicolopulos v. City of Lawndale* (2001) 91 Cal.App.4th 1221, 1228; Code Civ. Proc., § 803.)  Usually, " 'the action is filed and prosecuted by a private party who has obtained the consent of the Attorney General, for "leave to sue in *quo warranto*." ' " (*Nicolopulos*, at p. 1228.)  " ' The action is brought in the name of the People of the State of California "on the relation of" the private party who has been granted permission to bring the action.' " (*Ibid*.)

In those circumstances, PERB's only remedy was to order bargaining over the effects of the action. (*Id*. at p. 389.)

Here, the parties agree quo warranto would be "the exclusive remedy to challenge the ballot initiative" repealing or amending provisions of a city charter. (*Palo Alto*, *supra*, 5 Cal.App.5th at p. 1320.) But this does not mean the remedy of quo warranto is *limited* to challenging charter amendments, as PERB contends. PERB does not identify any authority for that premise. (Compare with *Int'l Assn. of Fire Fighters v. City of Oakland*, *supra*, 174 Cal.App.3d at p. 694 ["absent constitutional or statutory regulations providing otherwise, quo warranto is the only proper remedy where it is available"]; see also *Citizens Utilities Co. v. Super. Ct.* (1976) 56 Cal.App.3d 399, 407 [quo warranto properly invoked to oust utility company of a franchise based on allegations it provided consumers unpotable and impure water].) Nor we can find such a limitation in the text of Code of Civil Procedure section 803.

Quo warranto may have been unavailable when the Associations filed their unfair practice complaint in August 2020, before the election regarding Measure P had occurred. (See e.g., *Palo Alto*, *supra*, 5 Cal.App.5th at p. 1317 [noting quo warranto not available where union filed unfair practice charge before election regarding contested initiative].) "[U]nder section 3509, subdivision (b), the initial determination of whether an unfair practice charge under the MMBA is justified is within PERB's exclusive jurisdiction," and the Associations "could not have filed an action in superior court." (*Palo Alto*, at p. 1317.) But as in *Palo Alto*, it appears the Associations may now, post-election, seek to invalidate the voter-approved Measure P *provisions* in a separate judicial proceeding. (*Palo Alto*, at p. 1320 [election in which voters passed the initiative at issue did not render PERB's decision advisory since

PERB determined the city violated the MMBA, and the union "may separately elect to pursue the remedy of an action in quo warranto with the trial court" to challenge the initiative's validity]; see also *Boling II*, *supra*, 33 Cal.App.5th at pp. 384, 387 & 382, fn. 3, citing *Boling*, *supra*, 5 Cal.5th at pp. 904–911 [union filed a preelection unfair practice charge and, while PERB initially had exclusive jurisdiction over MMBA claim, the validity of the subsequently approved initiative had to be challenged in quo warranto].)

In sum, PERB exceeded its authority by declaring the voter-approved Measure P provisions void and unenforceable as to the Association-represented members. Because the initial determination as to "the appropriate remedy necessary to effectuate the purposes of [the MMBA], shall be a matter within the exclusive jurisdiction of the board" (§ 3509, subd. (b)), we remand the matter for PERB to determine whether to declare void the Board's *resolution* placing on the ballot the Measure P provisions subject to effects bargaining, or to impose any other remedy such as ordering the County to cease and desist from implementing the Measure P amendments on Association-represented employees until the County fulfills its effects bargaining obligation. (*Palo Alto*, *supra*, 5 Cal.App.5th at p. 1320.) Given this conclusion, we do not address the parties' arguments regarding the ambiguity or vagueness of PERB's cease and desist order.

Finally, we reject the County's argument that PERB lacks remedial authority over peace officers.[6] Section 3511 states PERB's jurisdiction "shall

---

[6] We deny the County's request for judicial notice of the legislative history of Senate Bill No. 739 (1999–2000 Reg. Sess.), made in a footnote in its opening brief. (Cal. Rules of Court, rule 8.252(a)(1) [to obtain judicial notice by a reviewing court, "a party must serve and file a separate motion with a proposed order"].) In any event, the legislative history is unnecessary to our decision.

not apply to persons who are peace officers as defined in Section 830.1 of the Penal Code." (§ 3511.) Penal Code section 830.1 lists peace officers by classification or title, such as "deputy sheriff" and "police officer." (*County of Orange* (2019) PERB Dec. No. 2657-M [44 PERC ¶ 30, p. 7].) Because section 3511 "refers to [Penal Code] section 830.1, it follows that section 3511 applies to natural persons listed in that section, not employee organizations." (*County of Orange*, at p. 7.) Thus, PERB explained, although section 3511 "excludes from PERB's jurisdiction claims brought by Penal Code section 830.1 peace officers, PERB has jurisdiction over claims brought by employee organizations covered by the MMBA, including those that represent or seek to represent bargaining units composed partially or entirely of Penal Code [section] 830.1 peace officers." (*County of Orange*, at p. 6.) PERB's reading of section 3511 is not clearly erroneous and we defer to its interpretation here. (*Boling*, *supra*, 5 Cal.5th at p. 913.)

Here, the Associations, not individual peace officers, filed claims against the County. PERB has jurisdiction over those employee organizations, and a remedial order as applied to the Associations' peace officer members does not exceed this jurisdiction.

**DISPOSITION**

PERB's findings regarding decisional bargaining and PERB's remedial order are annulled. The matter is remanded to PERB and it is directed to strike its remedial order. On remand, PERB must determine whether the decision to place SCC sections 2-392, subdivision (d)(2); 2-394, subdivisions (b)(3), (b)(4), (b)(5)(ii), (vii)–(ix), (e)(2), and (f) on the ballot was within the scope of representation under the MMBA as analyzed under *Claremont*, *supra*, 39 Cal.4th at page 638. It may then order any other appropriate relief

30

consistent with the views expressed within this opinion.  PERB's order is otherwise affirmed.  The parties shall bear their own costs on the writ.

_____
Rodríguez, J.

WE CONCUR:


_____
Fujisaki, Acting P. J.


_____
Petrou, J.


A163100

Counsel:

Liebert Cassidy Whitmore, Richard C. Bolanos, Heather R. Coffman and Marek Pienkos for Petitioner.

American Civil Liberties Union Foundation of Northern California, Inc., Allyssa Villanueva and Avram Frey; Committee for Law Enforcement Accountability Now as Amici Curiae on behalf of Petitioner.

Jose Felix De La Torre, Wendi L. Ross and Jessica S. Kim for Respondent.

Rains Lucia Stern St. Phalle & Silver, Timothy K. Talbot and Zachery A. Lopes for Real Party in Interest Sonoma County Deputy Sheriffs' Association.

Mastagni Holstedt, Kathleen N. Mastagni Storm and Taylor Davies-Mahaffey for Real Party in Interest Sonoma County Law Enforcement Association.